**D.R. WARD CONSTRUCTION CO., et al., Plaintiffs**

v.

**ROHM AND HAAS CO., et al., Defendants.**

No. MDL NO. 1684.
No. 2:05–CV–4157–LDD.

United States District Court, E.D. Pennsylvania.

May 30, 2006.

Krishna B. Narine, Law Office of Krishna B. Narine, Elkins Park, PA, for Plaintiffs Pro se.

Stephen W. Armstrong, Montgomery Mccracken Walker & Rhoads LLP, Steven E. Bizar, Buchanan Ingersoll, P.C., Peter Breslauer, Montgomery Mccracken Walker & Rhoads LLP, Philadelphia, PA, Jeremy J. Calsyn, Cleary Gottlieb Steen & Hamilton, LLP, Washington, DC, Andre L. Dennis, Stradley, Ronon, Stevens & Young LLP, Nancy J. Gellman, Conrad O'Brien Gellman & Rohn PC, Phila, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, Alan Kanzer, Alston & Bird LLP (N.Y.), Torsten M. Kracht, Alston & Bird LLP, New York City, Wayne A. Mack, Duane Morris LLP, Thomas J. McGarrigle, Lathrop B. Nelson, III, Montgomery McCracken Walker and Rhoads, L.L.P., Valerie Brand Pipano, Reed Smith LLP, Steven A. Reed, Harkins Cunningham, Philadelphia, PA, Brian E. Roof, Frantz Ward LLP, Cleveland, OH, Richard L. Scheff, Montgomery Mccracken Walker & Rhoads LLP, Howard D. Scher, Buchanan Ingersoll, PC, Colleen Healy Simpson, Harkins Cunningham LLP, Francis X. Taney, Jr., Buchanan Ingersoll PC, Catherine N. Walto, Rawle & Henderson LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Presently before the Court are defendants' joint motion to dismiss the second amended indirect purchaser complaint (Doc. No. 16), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33). For the following reasons, this Court grants defendants' motion in part and denies defendants' motion in part.

## I. Factual and Procedural History

This action was commenced by complaint on August 4, 2005. (Doc. No. 1).

On March 1, 2006, plaintiffs D.R. Ward Construction, Anna C. Furney, and David Pearman ("plaintiffs"), indirect purchasers of products containing plastics additives, filed a second amended complaint on behalf of an alleged class of Arizona, Tennessee, and Vermont entities that indirectly purchased plastics additives from defendants, various manufacturers and distributors of plastics additives, between January 1990 and January 2003. (*See* Second Am. Compl., Doc. No. 24, at ¶¶ 1, 34). Plaintiffs allege that defendants conspired to fix, maintain, or stabilize the price of plastics additives and to allocate markets in Arizona, Tennessee, and Vermont for the sale of plastics additives. (*See* Second Am. Compl., at ¶¶ 2, 25–27, 48, 55, 67). Plaintiffs assert causes of action under the antitrust statutes of Arizona,[1] Tennessee,[2] and Vermont ("state antitrust claims"),[3] and under the common law theory of unjust enrichment. (*Id.*, at ¶¶ 47–75).

## II. Discussion

Defendants' motion to dismiss consists of three primary arguments. First, defendants argue that plaintiffs lack standing to bring their state antitrust claims; defendants reason that the Supreme Court's standing analysis in *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereafter *"AGC"*), applies to plaintiffs' state antitrust claims, and that the injury suffered by plaintiffs, as indirect purchasers, is to remote to satisfy this standing analysis. (*See* Def. Br., at 4–15). Second, defendants argue that plaintiffs' antitrust claim under Tennessee law fails as a matter of law because

plaintiffs' second amended complaint lacks factual allegations to indicate that Tennessee commerce was substantially impacted by defendants' conduct. (*Id.*, at 15–17). Third, defendants argue that plaintiffs fail to state a claim for unjust enrichment under Arizona, Tennessee, and Vermont law for a variety of reasons, including the failure to allege a direct benefit, the failure to allege a causal relationship between the conferral of the benefit and the detriment to plaintiffs, and the derivative (if not parasitic) relationship between an unjust enrichment claim based upon antitrust conduct and a state antitrust claim. (*Id.*, at 18–22).

## A. Characterization of Motion

 Defendants' motion to dismiss is properly styled a Rule 12(b)(6) motion to dismiss. *See, e.g., Maio v. Aetna, Inc.*, 221 F.3d 472, n. 7 (3d Cir.2000) (treating motion to dismiss for lack of antitrust standing as Rule 12(b)(6) motion); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397–399 (3d Cir.2000) (evaluating antitrust standing under Rule 12(b)(6) rubric). Under Rule 12(b)(6), defendants bear the burden of showing that no claim has been stated. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991). Thus, a Rule 12(b)(6) motion may be granted only when it is clear, after allocating the burden of proof, that plaintiff can prove no set of facts in support of the claim which would entitle her to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb v. City of Philadelphia*, 733 F.2d 286, 290 (3d Cir.1984). In applying this standard, this

---

**1.** Plaintiffs' Arizona antitrust claim arises under the Arizona Antitrust Act ("AAA"), Ariz. Rev.Stat. §§ 44–1401, *et seq.*.

**2.** Plaintiffs' Tennessee antitrust claim arises under the Tennessee Trade Practices Act

("TTPA"), Tenn.Code Ann. §§ 47–25–101, *et seq.*.

**3.** Plaintiffs' Vermont antitrust claim arises under the Vermont Consumer Fraud Act ("VCFA"), 9 Vt. Stat. Ann. §§ 2451 *et seq.*.

Court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township*, 838 F.2d 663, 665–66 (3d Cir.1988). However, this Court need not credit bald assertions or legal conclusions in deciding a motion to dismiss. *See, e.g., Morse v. Lower Merion School Dist.*, 132 F.3d 902, 907 (3d Cir. 1997).

### B. State Antitrust Claims

Defendants contend that plaintiffs' claims under the AAA, the TTPA, and the VCFA fail as a matter of law for lack of prudential antitrust standing, based upon the Supreme Court's analysis in *AGC*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). (*See* Def. Br., at 4–15). Defendants also argue that plaintiffs' claim under the TTPA must be dismissed for the additional reason of failing to allege a substantial effect on Tennessee trade or commerce. (*Id.*, at 15–18).

### 1. Standing

■ The question of whether a plaintiff has standing to bring a cause of action in federal court is a jurisdictional issue, a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing to sue in federal court is a "federal question." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The resolution of this federal question presents a different analysis than the question of whether a party has standing to sue in state court. *Id.* Thus, even when a federal court sits in diversity jurisdiction, a plaintiff must meet the federal standing requirement. *See, e.g., Wheeler v. Travelers Ins. Co.*, 22 F.3d

534, 537 (3d Cir.1994); *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 352 (3d Cir.1986) (noting that "question of justiciability" of claim under state law "is a federal issue to be determined only by federal law").

■ The concept of standing is composed of constitutional and prudential considerations. To achieve standing, a plaintiff "must satisfy both the case and controversy requirements of Article III of the [United States] Constitution and certain prudential requirements." *See, e.g., Wheeler*, 22 F.3d at 537.

#### a. Constitutional Standing

■ The constitutional dimension of the standing doctrine ensures that a party has an actual "case or controversy" to meet the justiciability demands of Article III. To satisfy the constitutional requirements for standing, a plaintiff must allege: (1) injury in fact; (2) a causal nexus between the injury and the challenged conduct; and (3) the likelihood that a favorable judicial decision will redress the injury. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Joint Stock Society v. UDV North America, Inc.*, 266 F.3d 164, 175 (3d Cir. 2001). These requirements ensure that a plaintiff has a "personal stake" in the outcome of the proceedings. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38–40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ This Court finds that, when read in a light most favorable to plaintiffs, the allegations in plaintiffs' amended complaint meet the standard for constitutional standing, the " 'irreducible constitutional minimum' of standing." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 484 (3d Cir.1998). Plaintiffs allege that they paid inflated prices for products with plastics additives due to an

overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain, that plaintiffs' overpayment for products containing plastics additives was caused by the conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in prior to the price-fixing scheme. (*See* Second Am. Compl., at ¶¶ 1–2, 25–28, 47–72); *see, e.g., AGC,* 459 U.S. at 535 n. 31, 103 S.Ct. 897 (distinguishing between prudential and constitutional standing requirements and noting that any harm to the antitrust plaintiff "is sufficient to satisfy the constitutional standing requirement of injury in fact"). Tellingly, defendants do not assert that plaintiffs lack constitutional standing, but, instead, limit their argument in favor of dismissal to plaintiffs' failure to meet prudential standing considerations.

### b. Prudential Standing

■ The doctrine of prudential standing augments the constitutional dimensions of standing in federal court. Prudential standing consists of " 'a set of judge-made rules forming an integral part of judicial self-government.' " *See, e.g., Joint Stock Soc'y v. UDV North America, Inc.,* 266 F.3d 164, 179 (3d Cir.2001). These rules are intended to "avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Shutts,* 472 U.S. at 804, 105 S.Ct. 2965.

■ Of paramount importance in performing a prudential standing analysis is the source of the plaintiff's claim to relief, as the "standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Indicative of this interconnectedness between the source of plaintiff's cause of action and principles of prudential standing, the Supreme Court has acknowledged that a particular statutory enactment may abrogate these principles by prescribing an express right of action for certain persons. *Id.* at 501, 95 S.Ct. 2197. In other words, prudential standing considerations, which serve to limit a court's role in resolving public disputes, determine whether a particular plaintiff can sue under a particular statutory or constitutional provision, based in part upon the language of this provision. *Id.* at 500–501, 95 S.Ct. 2197.

### i. Background

In order to determine the appropriate standard to apply to determine whether federal prudential standing considerations permit plaintiffs to sue in federal court under the state antitrust statutes, the Court must briefly discuss the test for prudential antitrust standing under the federal antitrust statutes, the Sherman Act, 15 U.S.C. §§ 1–7, and the Clayton Act, 15 U.S.C. §§ 12–27.

In *Illinois Brick v. Illinois,* the Supreme Court concluded that, as a matter of law, indirect purchasers of price-fixed products do not suffer "injury" within the meaning of § 4 of the Clayton Act, which gives district courts jurisdiction to "prevent and restrain violations of [the Sherman Act]," including agreements among competitors to restrain trade. 431 U.S. 720, 728–729, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Supreme Court decision was based primarily upon policy considerations. *Id.; see AGC,* 459 U.S. at 529, 103 S.Ct. 897 (noting that literal reading of § 4 of

Clayton Act "is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation"). The *Illinois Brick* Court reasoned that permitting indirect purchasers to assert a cause of action under federal antitrust statutes based upon the passing-on of the overcharge to each link in the chain of manufacture or distribution would create an array of administrative, procedural, and substantive burdens, including, *inter alia*, a risk of multiple liability for defendants, hopelessly complex damages calculations requiring the apportionment of the overcharge among all potential plaintiffs—from wholesalers to middlemen to retailers to the ultimate purchaser—within the various distribution chains, and an increase in the costs of antitrust litigation with a concomitant reduction in the amount of recovery to each plaintiff. *Id.* at 730–732, 737–744, 97 S.Ct. 2061. These consequences, according to the Supreme Court, would deter the effective enforcement of federal antitrust laws. *Id.* at 741, 97 S.Ct. 2061.

■ Following *Illinois Brick*, the Supreme Court further limited the class of persons who can sue under federal antitrust law by crafting a test to determine prudential standing for those plaintiffs, now limited (with respect to monetary damages) to direct purchasers,[4] whose allegations fall within the literal scope of the federal antitrust statutes. In *AGC*, the Supreme Court identified an array of factors that courts must consider in determining whether a party has suffered an injury *too remote* to bring a cause of action for damages under the Sherman Act and the Clayton Act: (1) the causal connection between the antitrust violation and the harm to the plaintiff, and the defendant's intent to cause the harm; (2) whether the nature of plaintiff's alleged injury is of the type that the antitrust statutes were intended to remedy; (3) the directness or indirectness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust violations; (5) the potential for duplicative recovery; and (6) the danger of complex and/or speculative apportionment of damages. *AGC*, 459 U.S. at 537–45, 103 S.Ct. 897; *City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 264 (3d Cir. 1998) (applying AGC factors and characterizing AGC test as "prudential" standing analysis). The *AGC* test has been "regularly and consistently applied as the passageway through which [federal] antitrust plaintiffs must advance." *West Penn Power Comp.*, 147 F.3d at 264.

### ii. Relevance of *AGC* Factors to Existence of Prudential Standing for State Antitrust Claims

■ This Court finds that a court sitting in diversity jurisdiction need not apply federal case law concerning prudential antitrust standing to determine whether a party has standing to assert a cause of action under a state antitrust statute. Instead, to determine whether a diversity plaintiff possesses federal prudential standing to bring a claim under a state antitrust statute, this Court looks to the treatment of standing under the relevant state antitrust statutes.

Several reasons support this approach. First, because the concept of prudential standing in the antitrust context is intertwined with the substantive content of and intent behind the particular statute authorizing the cause of action, the standing requirements of the Vermont, Tennessee, and Arizona antitrust statutes, which rec-

---

**4.** Indirect purchasers may sue for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399–400 (3d Cir.2000); *Mid–West Paper Products Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 594 (3d Cir.1979).

ognize indirect purchaser claims, should be the guide for determining whether prudential considerations permit a plaintiff to sue under these statutes, as opposed to those requirements engrafted by federal case law onto federal antitrust statutes, which do not recognize indirect purchaser claims. *See, e.g., Warth,* 422 U.S. at 500, 95 S.Ct. 2197 (prudential standing "often turns on the nature and source of claim asserted"). Indeed, the opposite approach carries the potential to disrupt the governmental power equilibrium upon which the federal system operates; the federal judiciary would be entitled to disregard the intent of the state legislature, as reflected in the literal language of the state antitrust statute, by applying federal, judicially-fashioned principles of practicality, now detached from their federal statutory moorings, to determine whether a particular plaintiff is a "worthy" or "proper" candidate to sue under state law in a diversity action.[5] *See, e.g., California v. ARC America Corp.,* 490 U.S. 93, 103, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (noting that it is inappropriate to consider congressional policies that defined remedies available under federal antitrust law in determining "what federal law allows States to do under their own antitrust law," including who may recover under state antitrust statutes). This approach of deferring to state standing principles as the basis for federal prudential standing under a state antitrust statute appears consistent with the methodology of the majority of courts addressing this issue.

See, e.g., *Joint Stock Society,* 266 F.3d at 179 (looking to Delaware case law to determine whether standing exists under the Delaware Uniform Trade Practices Act, rather than automatically applying *AGC* factors); *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir. 2000) (applying state law principles of antitrust standing, which is broader than antitrust standing under federal law, to determine whether plaintiff milk producers could bring claim under California antitrust statute against cheese makers for depressing prices for milk); *Metropolitan Express Serv., Inc. v. City of Kansas City, Missouri,* 23 F.3d 1367, 1369 (8th Cir. 1994) (holding that in a diversity case, court will not address plaintiff's claims unless plaintiff has standing to sue under state law and meets Article III case or controversy requirement); *In re Napster, Inc. Copyright Litig.,* 354 F.Supp.2d 1113, 1125 (N.D.Cal.2005) (looking to California case law to determine whether standing exists for indirect purchaser under California's Cartwright Act, which prohibits agreements in restraint of trade). It also comports with critical commentary. *See, e.g.,* 13A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.14, at 90–91 (2d ed.1984) ("federal courts have stated that state law of standing should be applied as to state rights . . ., whether the state question arises in an original diversity action, on removal from state court, or as a matter of ancillary jurisdiction").[6] Finally, the Court

---

**5.** Although a plaintiff could still bring a claim in state court under the state antitrust statute, the possible foreclosure of access to federal courts for plaintiffs bringing state antitrust claims defeats the goals of diversity jurisdiction in the antitrust context.

**6.** Charles Wright and Arthur Miller emphasize the possible tension between prudential considerations of standing under federal law

and the conceptualization of standing to enforce a state right under state law:

> If a clear case should appear in which standing would be recognized by state rules but denied by prudential federal rules, the federal court would have to choose between the general obligation to exercise diversity jurisdiction and its doubts as to the wisdom of enforcing this state claim of this particular plaintiff. It does not seem likely that the same choice should be made for all

notes that defendants do not argue that the Court is required, through the doctrine of *stare decisis,* to apply the *AGC* factors as the standard for federal prudential standing in all antitrust cases, whether brought under a state or federal statute; instead, defendants argue that the *AGC* analysis applies to "state law standing" in part because the three alleged class jurisdictions have adopted this analysis for their state antitrust statutes. (*See* Def. Br., at 6).

In summary, the Court finds that it need not use the *AGC* factors as the framework for analyzing whether federal prudential considerations permit standing under the Vermont, Tennessee, and Arizona antitrust statutes, unless relevant state law adopts these factors. Phrased differently, the state rules of antitrust standing determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.

### iii. Standing Under Tennessee, Arizona, and Vermont Antitrust Statutes

Defendants present the following syllogistic logic to justify dismissal. First, although defendants properly acknowledge that the Supreme Courts of Tennessee, Arizona, and Vermont have interpreted their respective antitrust statutes as permitting antitrust claims by indirect purchasers of goods or services, defendants nonetheless argue that the question of whether an indirect purchaser may bring a

claim under the text of a relevant antitrust statute, which examines whether indirect purchasers can ever suffer a statutorily cognizable injury, is distinct from the question of whether the alleged injury is too remote to confer prudential antitrust standing, which examines the relationship between the injury and the cause of action. (*See* Def. Br., at 2–6).[7] Defendants then contend that Tennessee, Arizona, and Vermont law require application of the *AGC* test to determine whether an indirect purchaser plaintiff has standing to pursue an antitrust claim under state law. (*Id.,* at 6, 11, 14–15). Finally, applying the *AGC* analysis, defendants contend that each *AGC* factor militates in favor of denying standing to the instant plaintiffs. (*Id.,* at 8–11).

To determine the validity of defendants' logic, the Court must evaluate the standing limitations associated with each state antitrust statute. This requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the reasoning behind these decisions.

### (a) Arizona Antitrust Act

### (i) Standard

The Arizona Antitrust Act ("AAA") permits any "person threatened with injury or injured in his business or property" to sue

---

cases. It might be appropriate to deny standing on the basis of strong prudential objections, particularly if the interests pursued by the plaintiff seem remote and the substantive issues are sensitive. On the other hand, state standing might well be honored if there is a reasonable ground for seeking decision and the prudential objections are relatively weak.
*Id.* at 90–91.

7. This distinction is explicit under federal law. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Illinois Brick,* 431 U.S. at 728 n. 7, 97 S.Ct. 2061. There is nonetheless considerable overlap between these two issues, as both help define the question of who may sue under federal antitrust law and as similar considerations guide their resolution.

for redress of a violation of the statute. A.R.S. § 44–1408(b). The statute defines "person" as an "individual, corporation, business trust, partnership, association or any other legal entity." *Id.* § 44–1401. The statute contains a federal guidance clause, which states that it is "the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." *Id.* § 44–1412.

The Arizona Supreme Court recently analyzed the issue of standing to sue under the AAA. In *Bunker's Glass Co. v. Pilkington, PLC,* the Arizona Supreme Court rejected the logic of *Illinois Brick* and concluded that an indirect purchaser of goods and services has standing to sue under the AAA. 206 Ariz. 9, 75 P.3d 99, 102 (2003). The Court reasoned that the broad language of the statute permits an indirect purchaser suit, and noted that the Court must defer to the legislature, not the federal courts, to create limitations on the scope of a statutory right of action. *Id.* at 103, 107. The Court also reasoned that § 44–1412 renders the use of federal precedent permissive, rather than mandatory, and that, to the extent uniformity is desired, this uniformity extends only to the standard of conduct required, rather than "procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct." *Id.* at 103, 106. Furthermore, the Court rejected as unsubstantiated the fears that motivated the Supreme Court's decision in *Illinois Brick* to limit antitrust actions under federal law to direct purchasers, including the complexity of proving damages, the risk of multiple liability, and the eviscer-

ation of the incentive for direct purchasers and victims in general to bring antitrust suits. *Id.* at 107, 109. Finally, while noting that a plaintiff must be able to prove actual or threatened injury that is not too remote to generate prudential standing to proceed on a federal antitrust claim in federal court,[8] the *Pilkington* Court never expressed an intention to adopt this federal standing analysis for the AAA, and, in fact, appeared to distance Arizona law from federal considerations of standing in the antitrust context, expressly deciding to "follow the command of our constitution and afford greater protection to Arizona citizens by allowing them to attempt to prove" their antitrust claims through litigation rather than being "barred at the courthouse door." *Id.* at 110.

Despite the Arizona Supreme Court's liberalization of standing principles for plaintiffs suing under the AAA, an unpublished Arizona Superior Court decision recently applied a virtually unmodified version of the *AGC* test to determine whether an antitrust plaintiff's injuries were too remote to confer standing under the AAA. *See Luscher v. Bayer AG,* No. CV–2004–014835 (Ariz.Super. Ct. Maricopa Cty. Sept. 14, 2005). The *Luscher* Court cited the federal guidance clause in the AAA as its lone justification for relying upon the *AGC* analysis. *Id.*

▮ Notwithstanding the *Luscher* decision, this Court predicts that the Arizona Supreme Court would apply its traditional standing approach, rather than an *AGC* analysis, to determine whether an indirect purchaser has standing to pursue a claim under the AAA. Several reasons support

---

**8.** The *Pilkington* Court acknowledged that although federal law treats the question of whether a particular class of plaintiffs can be deemed, at the outset of litigation, not to suffer an antitrust injury as analytically distinct from the question of the remoteness of a particular injury, both questions implicate principles of standing. *See Pilkington,* 75 P.3d at 106 n. 8, 110.

this conclusion. First, *Pilkington* clearly represents the Arizona Supreme Court's hostile view not only towards the judicial erection of insurmountable standing barriers to claims under the AAA, in derogation of the legislative intent of the statute, but also towards the adoption of federal precedent to craft such barriers. *See Pilkington*, 75 P.3d at 107. Second, the AAA does not possess a mandatory harmonization clause requiring uniformity between federal and state antitrust precedent, and, furthermore, the permissive harmonization clause in the AAA has been interpreted as applying to substantive issues, rather than to procedural questions of standing. *See* A.R.S. § 44–1412; *Pilkington*, 75 P.3d at 106. Third, defendants fail to provide this Court with any decision from an intermediate appellate court in Arizona suggesting that the Arizona Supreme Court would apply an *AGC* analysis to determine standing under the AAA. *See, e.g., Paolella v. Browning–Ferris*, 158 F.3d 183, 189 (3d Cir.1998) (federal court sitting in diversity must predict how state's highest court would resolve issue and, in absence of definitive statement from highest court, district court may consider decisions from state appellate courts). Fourth, many of the considerations which motivated the Supreme Court to adopt the *AGC* analysis, including, *inter alia,* the avoidance of speculative and complex damages calculations, the prevention of duplicative recoveries, and the remediation of antitrust violations by those persons with the strongest motivation to pursue such claims, were rejected by the *Pilkington* Court as exaggerated, or at the very least, as subordinate to the more important objective of courthouse access for indirect purchasers of price-fixed products.

▮ Under Arizona law, the question of standing involves only principles of "judicial restraint," as there is no counterpart to the "case or controversy" requirement of the federal constitution. *See, e.g.,* *State v. B Bar Enter.*, 133 Ariz. 99, 649 P.2d 978, 980 n. 2 (1982). A litigant suing under a state statute possesses standing when the plaintiff sustains an injury in fact that is distinct and palpable, thereby giving the plaintiff a personal interest in the outcome of the controversy. *See, e.g., Armory Park Neighborhood Assoc. v. Episcopal Community Serv. In Arizona,* 148 Ariz. 1, 712 P.2d 914, 919 (1985); *Aegis of Arizona v. Town of Marana,* 206 Ariz. 557, 81 P.3d 1016, 1021–1022 (2003). This requirement is not rigorous; it is only meant to guarantee that courts "do not issue mere advisory opinions, that the case is not moot and that the issues will be fully developed by true adversaries." *Armory Park Neighborhood Assoc.,* 712 P.2d at 919.

### (ii) Application

▮ This Court finds that, accepting the allegations in the amended complaint as true, plaintiffs satisfy federal prudential considerations of standing because they would have standing to pursue their claim under the AAA in state court. For instance, as purchasers of products containing plastics additives, plaintiffs clearly possess an interest in the outcome of the litigation. (*See* Second Am. Compl., at ¶¶ 1, 34). Furthermore, plaintiffs have alleged an injury that is distinct and palpable, the amount of the overcharge that was passed-on to plaintiffs due to defendants' alleged price-fixing conspiracy. (*Id.,* at ¶¶ 49, 61, 68). These allegations comport with the standing requirements of Arizona law, and, in accordance with the teachings of *Pilkington,* plaintiffs satisfy federal prudential requirements of standing to bring a claim in federal court under the AAA.

### (b) Tennessee Trade Practices Act

### (i) Standard

The Tennessee Trade Practices Act ("TTPA") prohibits anti-competitive ar-

rangements which tend to lessen "full and free competition in the importation or sale of articles imported into this state . . . or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product . . . ." Tenn. Code Ann. § 47–25–101. The TTPA provides a civil remedy to "any person who is injured or damaged by any such arrangement." *Id.* § 47–25–106. The TTPA does not contain a clause requiring or permitting courts to interpret the TTPA consistent with federal law.

The Supreme Court of Tennessee recently declared that indirect purchasers of articles may bring a private action under the TTPA. *See, e.g., Freeman Indus. v. Eastman Chemical Co.,* 172 S.W.3d 512, 520 (Tenn.2005). The *Freeman* Court first reasoned that the plain language of the statute provides a private right of action to indirect purchasers. *Id.* at 517–518. The Court then reasoned that, unlike other state antitrust statutes, the TTPA lacks a mandatory harmonization clause requiring consistency between interpretations of the TTPA and interpretations of federal antitrust statutes. *Id.* at 519. Finally, the Court rejected the concerns that motivated the United States Supreme Court to interpret the Clayton Act and Sherman Act as precluding all indirect purchaser claims, explaining that indirect purchasers are frequently the "real victims of the antitrust violations," that courts are competent to handle the risk of multiple liability and recovery under the TTPA, and that justice should not be defeated by the speculative risk of complex damages assessments. *Id.* at 520.

■ This Court predicts that the Supreme Court of Tennessee, based upon the *Freeman* decision, would apply traditional standing requirements rather than the *AGC* analysis to determine whether the injuries suffered by an indirect purchaser

are too remote to confer standing under the TTPA. Several reasons support this conclusion. First, the TTPA does not contain a harmonization clause requiring cohesion between federal and state law. *See Freeman,* 172 S.W.3d at 519. Second, imposing a strict standing requirement would undermine many of the goals that the TTPA sought to achieve, including affording a remedy to indirect purchasers, that class of persons the Tennessee Supreme Court has deemed the "real victims" of antitrust conduct. *Id.* at 520. Third, the *Freeman* Court rejected as unfounded many of the fears that motivated the Supreme Court in *AGC* and *Illinois Brick* to craft judicial standing limitations on who may sue under federal antitrust law. *Id.* Fourth, defendants present no Tennessee decision suggesting that the standing analysis of *AGC* would be superimposed upon the TTPA to determine whether an indirect purchaser can proceed with litigation.

■ A party has standing to sue under Tennessee law when she meets the minimum constitutional requirements of standing under federal law. *See, e.g., In re Petition of Youngblood,* 895 S.W.2d 322, 326 (Tenn.1995) (adopting federal constitutional standard); *Cox v. Shell Oil Co.,* 196 S.W.3d 747, 757–58 (Tenn.Ct.App.2005) (state law standing "parallels the constitutional restriction on federal court jurisdiction to 'cases and controversies' "). In other words, a party suing under a Tennessee statute must demonstrate that she has sustained a distinct and palpable injury, that the injury was caused by the challenged conduct, and that the injury is capable of being redressed by a judicial remedy. *See, e.g., Metro. Air Research Testing Auth., Inc. v. Metro. Gov't,* 842 S.W.2d 611, 615 (Tenn.Ct.App.1992).

**(ii) Application**

■ Because this Court has already determined that plaintiffs satisfy principles

of constitutional standing, plaintiffs also satisfy principles of standing under Tennessee law, including, absent direction from a Tennessee appellate court otherwise, under the TTPA. Principles of federal prudential standing therefore do not bar this Court from hearing plaintiffs' claim under the TTPA.

### (c) Vermont Consumer Fraud Act

### (i) Standard

 The Vermont Consumer Fraud Act ("VCFA") prohibits unfair and deceptive methods of competition in commerce. 9 V.S.A. § 2453(a). The VCFA provides a private remedy for "any consumer who . . . sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title." *Id.* § 2461(b). In 2000, the Vermont legislature passed an amendment to the VCFA clarifying the right of any "person" to recover for damages or injury sustained as a result of any violation of state antitrust laws, including § 2453(a), regardless of whether the person dealt directly with the defendants. *Id.* § 2465(b). The purpose behind § 2465(b) is to clarify the right of an indirect purchaser to obtain recovery for a violation of the state antitrust law. *See, e.g., Elkins v. Microsoft Corp.,* 174 Vt. 328, 817 A.2d 9, 17 (2002). Construction of § 2453(a) must be guided by the "construction of similar terms contained in section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States." *Id.* § 2453(b).

Although the 2000 amendment to the VCFA expressly authorized indirect purchaser antitrust actions, the Vermont Supreme Court has interpreted the VCFA as providing a cause of action for indirect purchasers of products subject to unfair competition prior to the 2000 amendment.

*See Elkins v. Microsoft Corp.,* 817 A.2d at 20. In reaching this conclusion, the *Elkins* Court privileged the clear language of the statute, which allows suits by "any consumer" against any "violator" without an interpolative privity requirement. *Id.* at 13. The *Elkins* Court then found that the legislative intent behind the VCFA, which confers "as broad as reach as possible in order to best protect consumers against unfair trade practices," elides any distinction between direct and indirect purchasers. *Id.* Moreover, the *Elkins* Court interpreted the 2000 amendment not as prescribing a new cause of action, but as clarifying the preexisting right of indirect purchasers to recover for a violation of the VCFA. *Id.* at 17. Finally, the *Elkins* Court provided a detailed analysis of why the harmony clause in § 2453(b) renders inapplicable federal court decisions interpreting federal antitrust statutes, including the Clayton Act and Sherman Act, to the construction of the VCFA. *Id.* at 16–17.

Two decisions by the Superior Court of Chittenden County, Vermont recently applied the *AGC* factors to determine whether an antitrust defendant possesses standing to bring a claim under the VCFA, at least to the extent that these factors are consistent with allowing indirect purchaser standing. *See, e.g., Fucile v. Visa U.S.A. Inc.,* 2004 WL 3030037, at *2 (Vt.Super.Ct. Dec. 27, 2004); *Investors Corp. of Vermont v. Bayer AG,* Doc. No. S1011–04–CnC (June 1, 2005). The *Fucile* Court reasoned that because the *AGC* factors help determine whether a case or controversy exists under Article III of the Constitution, and that because the Vermont Supreme Court has adopted constitutional principles of standing in other contexts, the Vermont Supreme Court would apply the *AGC* factors to determine a party's standing under the VCFA. *Fucile,* 2004

WL 3030037, at *3. The *Bayer* Court relied without scrutiny upon the methodology in *Fucile*. *See Bayer*, Doc. No. S1011–04–CnC, at *3 (applying *AGC* analysis based upon *Fucile* precedent).

This Court cannot conclude as a matter of law that the Vermont Supreme Court would adopt the *AGC* factors for determining standing under the VCFA. Several reasons support this analysis. First, the harmonization clause in the VCFA does not require consistency between construction of the VCFA and construction of the Clayton Act and Sherman Act. *See Elkins*, 817 A.2d at 17. In fact, the Vermont Supreme Court expressly rejected the argument "that the definition of who may sue under the Act [VCFA] must be consistent with the definition of who may sue under federal antitrust law." *Id.* Second, imposing an *AGC* analysis on the VCFA would severely limit the number of indirect purchasers who can bring suit under the statutory scheme, thereby rewriting the language of the 2000 amendment to the VCFA and undermining the VCFA's overarching remedial goal of reaching as broadly as possible to best protect consumers against antitrust violations. *Id.* at 13. Third, defendants present no appellate court decision applying the *AGC* test to determine antitrust standing under the VCFA. Finally, the Court rejects as flawed the rationale provided by the *Fucile* Court for applying the *AGC* antitrust standing analysis: the *AGC* analysis, a gauge for determining prudential standing under federal antitrust statutes, is distinct from the inquiry into standing under Article III of the Constitution; and, although the Vermont Supreme Court applies the test for constitutional standing in other contexts, it has yet to apply the *AGC* factors to determine prudential standing under any state statute.

■■ Because this Court cannot determine as a matter of law that the Vermont Supreme Court would conduct an *AGC* analysis to determine standing under the VCFA, the Court applies traditional Vermont standing principles. The Vermont Supreme Court has adopted, in general, the constitutional and prudential components of the federal standing doctrine. *See Schievella v. Dep't of Taxes*, 171 Vt. 591, 765 A.2d 479, 481 (2000). The first prong of this test is identical to the case-or-controversy analysis under the federal Constitution. *See, e.g., Brigham v. State*, 889 A.2d 715, 719, 721 (Vt.2005) ("Vermont has adopted the case-or-controversy requirement"); *Agency of Natural Resources v. United States Fire Ins. Co.*, 173 Vt. 302, 796 A.2d 476, 479 (2001) (noting that Vermont has adopted case-or-controversy requirement in which plaintiffs, to have standing, must have suffered particular injury that is attributable to defendant and court must be capable of redressing injury). The second prong of this test-the prudential element of standing—evaluates whether plaintiff is raising another person's legal rights, whether plaintiff asserts a general grievance, and whether plaintiff's claims fall within the "zone of interest" protected by the invoked law. *See Hinesburg Sand & Gravel Co., Inc. v. State*, 166 Vt. 337, 693 A.2d 1045, 1048 (1997).

### (ii) Application

■■ Plaintiffs satisfy the constitutional elements of standing. Furthermore, it is clear that plaintiffs' indirect purchaser claim falls within the "zone of interest" protected by the VCFA, which was amended in 2000 to permit such causes of action, and that plaintiffs' desire for damages based upon passed-on overcharges is not a general grievance. Accordingly, this Court finds that plaintiffs meet general standing requirements under Vermont law to bring a claim under the VCFA, and,

therefore, that plaintiffs satisfy prudential federal standing considerations for the VCFA claim in this diversity action.

### (iii) *AGC* Analysis

 Assuming *arguendo* that the *AGC* factors applied to determine federal prudential standing for plaintiffs' state antitrust claims, this Court finds that defendants have failed to meet their burden of demonstrating at the motion to dismiss phase that these factors do not confer standing as a matter of law.

### (a) Causal Connection and Improper Motive

Plaintiffs allege that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy. (*See* Second Am. Compl., at ¶¶ 1, 25, 40, 49, 53, 61, 70, 72). Plaintiffs further allege an improper motive on the part of defendants in engaging in price-fixing activities and in concealing these activities. (*Id.*, at ¶¶ 25–27, 32–33). Furthermore, although facts external to the complaint, such as the percentage of plastic additives in the products plaintiffs purchased, carry the potential to impact the causation analysis, these facts are irrelevant to the resolution of defendants' motion to dismiss, which relies entirely upon what the complaint states. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 399 (reversing district court's finding of no antitrust standing for indirect purchaser at motion to dismiss stage because district court improperly relied upon facts outside allegations); *Bayer AG*, Doc. No. S1011–04 CnC, at *4 (causation factor of standing analysis for claim under VCFA satisfied at motion to dismiss phase because external facts render court better suited to assess causation at class certification and summary judgment stages); *Crouch v. Crompton Corp.*, 2004 WL 2414027, at *24 (N.C Super. Ct. Oct. 28, 2004) (identifying facts relevant to resolution of *AGC* causation analysis for indirect purchasers under state antitrust statute). Accordingly, the Court finds at this juncture that a sufficient causal nexus exists between the injury and defendants' allegedly anti-competitive behavior. *See, e.g., Kraft Foods, Inc.*, 232 F.3d at 989 (finding sufficient causation and direct injury to confer antitrust standing under state antitrust statute in part because "disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion").

### (b) Nature of Injury in Relation to Purpose of Antitrust Statutes

Although plaintiffs allege that they purchased products containing plastics additives, and, by implication, that they are members of a secondary market of products indirectly influenced by the artificial pricing of the plastics additives market, the Supreme Courts of Arizona, Vermont, and Tennessee have declared respectively that the intent of the AAA, the TTPA, and the VCFA was to provide redress to indirect purchasers who purchase from retailers a product subject to a price-fixing conspiracy. *See, e.g., Pilkington*, 75 P.3d at 102, 105 n. 3 (noting Arizona legislature's intent to allow indirect purchasers to sue and refusing to distinguish between forms of indirect purchaser suits allowed); *Freeman*, 172 S.W.3d at 518 (reading TTPA as permitting an indirect purchaser to "recover from the antitrust violator the amount of the overcharge that the direct purchaser passed on to the indirect purchaser"); *Elkins*, 817 A.2d at 13 ("The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices."). There is no indication that the AAA, the TTPA, and the VCFA were enacted to provide remedies to certain types of indirect purchasers, such as those

who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers which function at a lower level in the distribution chain, such as end consumers who purchase products containing an ingredient subject to the price-fixing conspiracy. In other words, if plaintiffs can show that the unlawful increase in the price of plastics additives affected the cost of the products they purchased, regardless of whether plaintiffs participated in the immediate market for plastics additives or the secondary market for products with plastics additives, the AAA, the TTPA, and the VCFA would appear to contemplate recovery. *See, e.g., Bayer AG*, Doc. No. S1011–04 CnC, at *5. This factor therefore weighs in favor of standing.

### (c) Directness of Injury

Although plaintiffs are purchasers of products containing plastic additives, which is the subject of the antitrust restraint, plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, suggests that plaintiffs have suffered the greatest, if not the most direct, injury of the alleged antitrust conspiracy. (*See* Second Am. Compl., at ¶¶ 49, 51, 53, 60, 70). For instance, plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives. *See Pilkington*, 75 P.3d at 109 n. 9 (indirect purchasers are often "the truly injured party" due to passage of overcharges along chain of distribution); *Freeman*, 172 S.W.3d at 520 (indirect purchaser who ultimately paid overcharge is "real" victim of antitrust violation). Indeed, defendants concede that plaintiffs allege that they were harmed when direct purchasers of plastic additives

"passed on, in the form of increased prices for unspecified goods manufactured with or containing 'Plastic Additives,' some or *all* of the increase in their costs of doing business." (*See* Def. Br., at 9) (emphasis added). To the extent that defendants challenge the veracity of these allegations, the discovery process is necessary to develop an array of factual issues that bear upon the directness of the plaintiffs' injury, such as plaintiffs' positioning within the chain of distribution of plastics additives, the structure of the distribution chain, the degree to which the artificially increased portion of the price of plastics additives was passed along the distribution chain or absorbed by more direct purchasers, and the impact of intra- and extra-market factors on the price of products containing plastics additives. *See Crouch*, 2004 WL 2414027, at *19, *24; *see also In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 398 (reversing dismissal of federal antitrust claims for lack of antitrust standing because district court impermissibly relied upon facts beyond allegations in complaints). Accordingly, accepting the allegations in the complaint as true, the Court finds that the directness of the injury prong weighs in favor of standing.

### (d) More Direct Purchasers

There are clearly more direct victims of the alleged price-fixing conspiracy. However, this factor loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers. Put differently, the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes, like the AAA, TTPA, and the VCFA. Furthermore, to the extent that this factor should be modi-

fied to evaluate the existence of other indirect purchasers with a more direct link to the price-fixing conspiracy, this Court lacks the necessary facts to perform this evaluation, such as information regarding the various chains of distribution of plastics additives, the links that comprise these chains, plaintiffs' positioning within this network, the absorption and passing-on pattern for each entity in this network, and the range of other possible influences on the price of plastics additives. *See Crouch*, 2004 WL 2414027, at *19. This factor therefore does not mandate dismissal at this procedural stage in this litigation.

### (e) Speculative Nature and Complexity of Damages

This Court, following the respective analytical underpinnings of the *Pilkington, Freeman,* and *Elkins* decisions, refuses to find as a matter of law that damages to indirect purchasers under the AAA, the TTPA, and the VCFA are *per se* too speculative or too tenuously connected to the alleged wrongdoing to confer antitrust standing. Nor is this Court able to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge suffered by the instant plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert testimony. *See, e.g., Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1171 (9th Cir.2002) (refusing to find damages too speculative at motion to dismiss stage because antitrust plaintiffs must be afforded opportunity to evidence to support allegation at later stage in proceedings); *Crouch,* 2004 WL 2414027, at *25 (noting that there "may well be occasions on which the Court should defer a standing determination until there has been far ranging discovery and expert evidence produced on pass through and allocation"). The Court also notes that defendants have failed to articulate, with specificity, why the measurement of plaintiffs' damages would be unascertainable and why this Court would lack the capacity to scrutinize the evidence and resolve complex issues of damages apportionment. Accordingly, this factor does not weigh in favor of dismissal for lack of antitrust standing at this point in the proceedings.

### (f) Duplicate Recovery

Defendants argue that any damages awarded to indirect purchasers of plastics additives would duplicate the recovery by direct purchasers of plastics additives, which are currently pursuing class action litigation against defendants under the Sherman Act. (*See* Def. Br., at 10). Again, this factor proves inapposite when used to determine standing under state antitrust statutes that permit indirect purchaser claims, which necessarily presuppose the possibility of recovery, and the apportionment of damages for injuries actually incurred, among direct purchasers and a range of indirect purchasers based upon proof of the passage of the artificially inflated cost of plastics additives. Nor have defendants presented any argument as to why the existence of a direct purchaser claim against defendants under the Sherman Act should influence whether indirect purchasers have antitrust standing under state antitrust claims. *See, e.g., ARC America Corp.,* 490 U.S. at 105, 109 S.Ct. 1661 (finding that states may adopt state antitrust statutes with broader scope than federal counterparts in part because absence of federal policy against states imposing liability through state antitrust statutes in addition to that imposed by federal law through federal antitrust statutes and because state statutes cannot affect remedies available under federal law); *Crouch,* 2004 WL 2414027, at *19, *24

(suggesting relevant inquiry with respect to this factor should be existence of double recovery on state claim). Moreover, it would be presumptive for this Court to find at this early stage in the proceedings, prior to discovery, that plaintiffs will be unable to present a reliable method of identifying the effects of the price fixing, including the degree of absorption of the price increase, among those participants in the distribution chain or chains. Accordingly, at this juncture, this factor weighs in favor of standing.

### (g) Conclusion

In summary, assuming *arguendo* the applicability of the *AGC* factors to claims under the AAA, the TTPA, and the VCFA, the Court finds that the allegations in the complaint satisfy each of the *AGC* factors at the motion to dismiss stage. An antithetical ruling not only would require the Court to impermissibly rely on facts external to the pleadings, but also would deprive plaintiffs of the opportunity to discover and to confirm such facts through the discovery process.

### 2. Allegations of TTPA Violation

Defendants also argue that plaintiffs' claim under the TTPA should be dismissed for failing to allege that defendants' anti-competitive behavior produced a substantial effect on Tennessee commerce. (*See* Def. Br., at 15–18).

■■ To state a claim under the TTPA, a plaintiff must allege, *inter alia*, that the "alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree." *See Freeman*, 172 S.W.3d at 523. In *Freeman*, the Tennessee Supreme Court held that an out-of-state plaintiff which purchased food products containing sorbates, the subject of the price-fixing conspiracy, failed to allege facts to suggest a substantial effect on

Tennessee commerce. *Id.* at 524. Although plaintiff alleged that a co-defendant, from its principal place of business in Tennessee, conspired to fix the price of sorbates and to take orders and implement sales of sorbates to direct customers at supra-competitive prices, plaintiff never alleged that it purchased sorbates from this co-defendant, the lone defendant with ties to Tennessee. *Id.* The *Freeman* Court therefore affirmed the trial court's dismissal of plaintiff's TTPA claim. *Id.*

■■ In contrast to the situation in *Freeman*, the allegations in plaintiffs' second amended complaint clearly meet the "substantial effects" standard. Plaintiff David Pearlman, unlike the out-of-state plaintiff in *Freeman*, is a Tennessee resident who indirectly purchased plastics additives. (*Id.*, at ¶ 5). Each defendant is alleged to have manufactured, marketed, and sold plastics additives in Tennessee during the proposed class period. (*Id.*, at ¶¶ 6–14). Plaintiffs further allege that defendants conspired to fix the price of plastics additives sold in Tennessee, that plaintiff Pearlman and other Tennesseans paid higher prices in Tennessee for products containing plastics additives as a result of the price-fixing conspiracy, and that the alleged price-fixing conspiracy injured the businesses and property of plaintiff Pearlman and other Tennesseans. (*Id.*, at ¶¶ 60–65); *see In re New Motor Vehicles Canadian Export Antitrust. Litig.*, 350 F.Supp.2d 160, 173 (D.Me.2004) (denying motion to dismiss indirect purchaser claim under TTPA for failure to allege substantial effects on Tennessee commerce because factual allegations generated inference that defendant-manufacturers wholesaled their vehicles to dealers in Tennessee and made significant profits from Tennessee transactions); *Freeman*, 172 S.W.3d at 523 (suggesting by negative implication that allegation of influence of

anti-competitive conduct on market prices within Tennessee substantially affects intrastate commerce). Simply put, if these allegations do not satisfy the "substantial effects" test, the Court is unable to envision allegations which would.

## C. Unjust Enrichment Claims

Defendants argue that plaintiffs' unjust enrichment claims fails for two independent reasons. First, defendants argue that plaintiffs' unjust enrichment theory of liability is an inappropriate attempt to circumvent the limitations of plaintiffs' statutory antitrust claims. (*See* Def. Br., at 19–21). Second, defendants argue that plaintiffs' allegations are factually insufficient to state a cause of action for unjust enrichment under Tennessee, Vermont, or Arizona state law. (*Id.*).

### 1. Availability

Defendants argue that, in jurisdictions which possess antitrust statutes conferring standing on indirect purchasers, an indirect purchaser may only bring a statutory claim for alleged anti-competitive behavior. (*See* Def. Br., at 18–19). Defendants further contend that, if plaintiffs' state antitrust claims are defective, plaintiffs may not recover restitution through an unjust enrichment claim based upon the predicate wrong of the antitrust violation; indeed, according to defendants' logic, plaintiffs should not be permitted to make an "end run" around the standing limitations of antitrust laws. (*Id.*, at 19).

■ This Court rejects defendants' arguments, finding instead that plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee, and Vermont law and that the viability of these claims does not hinge upon the success of the state statutory antitrust claims. The following reasons buttress this conclusion.

First, the Tennessee Supreme Court expressly permits independent unjust enrichment claims by indirect purchasers, and defendants cite no cases under Arizona or Vermont law that preclude indirect purchasers from bringing unjust enrichment claims against the manufacturers of products subject to an alleged price-fixing conspiracy. *See Freeman*, 172 S.W.3d at 524–526. Second, the success of plaintiffs' common law unjust enrichment claims should not necessarily depend upon the success of their state antitrust claims, particularly because the Federal Rules of Civil Procedure permit parties to plead claims in the alternative and because, in practice, equitable remedies for unjust enrichment claims are often awarded when state statutory claims prove unsuccessful. *See, e.g., In re Cardizem Antitrust Litig.*, 105 F.Supp.2d 618, 669 (E.D.Mich.2000) (denying motion to dismiss unjust enrichment claims for amount of overpayment by indirect purchasers allegedly subject to overcharge in part because unjust enrichment claims are not contingent upon success of statutory antitrust violation). Third, even if an antitrust plaintiff's unjust enrichment claim under state law is tied to the remedies available under the state antitrust claim, defendants fail to analyze the statutory language of the AAA, the TTPA, and the VCFA to determine whether these antitrust statutes permit equitable remedies, such as the recovery of restitution. *See In re New Motor Vehicles Canadian Export Antitrust. Litig.*, 350 F.Supp.2d 160, 209–212 (D.Me.2004) (denying defendants' motion to dismiss indirect purchasers' restitution claim under state law for each of fifty states, which is based upon wrongful conduct in violating state antitrust laws, because defendants failed to argue that state statutes permitting indirect purchaser claims fail to authorize restitutionary re-

lief).[9] Finally, and perhaps most importantly, assuming *arguendo* the validity of the logic underlying defendants' argument, that an "indirect purchaser can only state a claim for unjust enrichment if the jurisdiction in question recognizes a statutory antitrust claim on behalf of indirect purchasers," defendants' argument actually supports the viability of plaintiffs' unjust enrichment claims: Tennessee, Arizona, and Vermont all permit indirect purchasers to pursue antitrust claims; thus, an unjust enrichment claim would not circumvent the procedural and substantive limitations of these antitrust statutes. (*See* Def. Br., at 19); *see In re Terazosin Hydrochloride Antitrust Litig.*, 160 F.Supp.2d 1365, 1380 (S.D.Fl.2001) (permitting unjust enrichment claims by indirect purchasers to be pled under the common law of jurisdiction that allows indirect purchasers to recover "passed on" overcharges).

### 2. Adequacy of Allegations

#### a. Arizona law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Arizona law because it fails to allege that plaintiffs conferred a direct benefit on defendants. (*See* Def. Br., at 20–21).

■ To succeed on a claim for unjust enrichment under Arizona law, a plaintiff must establish the following five elements:

(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a remedy provided by law. *See, e.g., Community Guardian Bank v. Hamlin*, 182 Ariz. 627, 898 P.2d 1005, 1008 (Az.Ct.App. 1995). Despite defendants' contentions otherwise, Arizona law does not require either a direct causal connection between the enrichment and the impoverishment, or the transference of a direct enrichment from the plaintiff to the defendant. *See, cf., In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d at 671 (finding that common law unjust enrichment theory of liability does not require passing of direct benefit from plaintiff to defendant and permitting indirect purchasers of heart medication subject to antitrade conspiracy to sue manufacturers of heart medication for unjust enrichment); *see also* Daniel R. Karon, *Undoing The Otherwise Perfect Crime–Applying Unjust Enrichment To Consumer Price–Fixing Claims*, 108 W. Va. L.Rev. 395, 421 (2005) (no state's unjust enrichment law requires conferral of direct benefit from plaintiff to defendant). Nor do the cases cited by defendants stand for this proposition.[10]

Plaintiffs' amended complaint states a claim under Arizona law. Plaintiffs allege facts to suggest that defendants were enriched by inflating in collusive fashion the

---

9. For instance, the AAA expressly permits a person "injured in his business or property" to "bring an action for appropriate injunctive or other equitable relief ..." Ariz.Rev.Stat. § 44–1408(B).

10. The analyses in these cases hinge on the absence of any impoverishment, as compared to the lack of a direct enrichment. *See, e.g., Stapley v. American Bathtub Liners*, 162 Ariz. 564, 785 P.2d 84, 88 (1989) (reversing jury verdict for vendor of property on unjust enrichment claim against purchaser who pos-

sessed property prior to closing with legal consent of vendors, but who never paid rent, because no showing of impoverishment and because whatever benefit attached to purchaser was presumably included in purchaser price of property); *Sierra Vista v. Cochise Enter., Inc.*, 144 Ariz. 375, 697 P.2d 1125, 1131 (1984) (finding *quantum meruit* claim waived because appellants' never raised theory of liability prior to or during trial and noting in dicta that *quantum meruit* claim would fail because no impoverishment).

price of plastics additives, a practice driven by recognition of the demand of end-use consumers for products with plastics additives;[11] that plaintiffs were impoverished by paying the inflated price; that plaintiffs' overpayment flowed up the distribution chain to inure to defendants' financial benefit; and that principles of equity demand disgorgement of this benefit. (*See* Second Am. Compl., at ¶¶ 25, 53, 61, 72, 74–75). Although this Court makes no determination as to whether plaintiffs will ultimately prevail on their unjust enrichment claim under Arizona law, they have alleged facts that survive a motion to dismiss. *See* Karon, 108 W. Va. L.Rev. at 428.

#### b. Vermont law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Vermont law because it fails to allege that plaintiffs conferred a direct benefit on defendants. (*See* Def. Br., at 20–21).

 Under Vermont law, a claim for unjust enrichment lies when a party confers a benefit upon another party and retention of the benefit would be inequitable. *See, e.g., Brookside Memorials, Inc. v. Barre City*, 167 Vt. 558, 702 A.2d 47, 49 (1997). Again, in contrast to defendants' assertions, none of the cases cited by defendants stands for the proposition that a plaintiff must confer a "direct benefit" upon a defendant to succeed on an unjust

enrichment claim under Vermont law.[12] In fact, a least one Vermont court has permitted an indirect purchaser to proceed on an unjust enrichment claim against the manufacturers of a product subject to a price-fixing conspiracy, holding that "Vermont law does not require that the enrichment be directly conferred from one party to another in order for the latter party to have a colorable claim for unjust enrichment" *See, e.g., Bayer AG*, Doc. No. 51011–04 CnC, at *6 (denying motion to dismiss unjust enrichment claim by indirect purchaser of products with chemical ingredient subject to price-fixing conspiracy against manufacturers of chemical ingredient); Karon, 108 W. Va. L.Rev. at 421.

Plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, states a cause of action for unjust enrichment under Vermont law. Plaintiffs' factual allegations suggest that they conferred a benefit on defendants in the form of overpayments for the plastics additives component of the products plaintiffs purchased, an overpayment that defendants should have anticipated at the time of the consummation of the alleged price-fixing conspiracy. (*See* Second Am. Compl., at ¶¶ 25, 32, 53, 61, 72, 74–75). Plaintiffs further allege that, by virtue of defendants anti-competitive conduct, the retention of such overpayments would be inequitable. (*Id.*). Accordingly, plaintiffs have ade-

---

11. The Third Circuit has noted that a price-fixing conspiracy among manufacturers of a product would not exist if there was no ultimate consumer of the product, regardless of the various links of middlemen. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 401.

12. These cases simply do not address this issue. *See In re Estate of Elliott*, 149 Vt. 248, 542 A.2d 282, 285 (1988) (affirming denial of unjust enrichment claim due to creditors' fail-

ure to introduce evidence of estate's receipt of "any benefit" of creditors' services); *Land Inv., Inc. v. Battleground Assoc.*, 138 Vt. 316, 415 A.2d 753, 759 (1980) (denying unjust enrichment claim without analysis because claim premised on impermissible legal contention that "one who borrows money to purchase real estate and defaults in the loan obligation unjustly enriches the seller at the expense of the lender").

quately pled a cause of action for unjust enrichment.

### c. Tennessee law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Tennessee law because it fails to allege that plaintiffs pursued remedies against the parties from whom plaintiffs purchased products or that this pursuit would be futile. (*See* Def. Br., at 21).

██ The elements of an unjust enrichment claim under Tennessee law include: (1) any benefit, whether direct or indirect, conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; (3) acceptance of the benefit under circumstances that render inequitable or unjust the receipt of the benefit without corresponding payment of its value; and (4) exhaustion of all remedies against the person with whom plaintiff enjoyed privity of contract, unless exhaustion would be futile. *See, e.g., Freeman,* 172 S.W.3d at 525.

Plaintiffs do not allege that, prior to filing suit against defendants, plaintiffs pursued remedies against the parties from which plaintiffs purchased products containing plastics additives (i.e., more direct purchasers of plastics additives).[13] Nor do plaintiffs allege that the pursuit of claims against these entities would be futile. *See, e.g., Freeman,* 172 S.W.3d at 526 (finding error in denial of defendants' motion for summary judgment on unjust enrichment claim when indirect purchaser fails to pro-

vide facts in support of bare allegation that attempt to pursue remedies against downstream seller of product would be futile). Moreover, plaintiffs fail to address defendants' exhaustion of remedies argument in their brief, let alone to provide affidavits identifying either the measures plaintiffs took to seek relief from intervening links in the chain of distribution of plastics additives and/or the futility of such measures. Accordingly, without such allegations, plaintiffs' unjust enrichment claim is premature and the Court grants without prejudice defendants' motion to dismiss plaintiffs' unjust enrichment claim under Tennessee law.

### D. Conclusion

For the preceding reasons, this Court grants without prejudice defendants' motion to dismiss plaintiffs' claim for unjust enrichment under Tennessee law and denies defendants' motion to dismiss in all other respects. An appropriate Order follows.

### *ORDER*

AND NOW, this 30th day of May 2006, upon consideration of defendants' joint motion to dismiss the second amended indirect purchaser complaint (Doc. No. 26), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33), it is hereby ORDERED as follows:

1. Defendants' motion (Doc. No. 26) is GRANTED in part and DENIED in part.

---

**13.** The Court finds that the "exhaustion of remedies" requirement to an unjust enrichment claim under Tennessee law makes little sense in this context unless a party is required to take such remedial steps prior to filing suit against the parties with whom the prospective plaintiff lacks a direct relationship. *See, e.g., Amsouth Erectors, LLC v. Skaggs Iron Works, Inc.,* 2003 WL 21878540, at *6 (Tenn.Super.Ct. Aug. 5, 2003) (purpose of exhaustion of remedies requirement is to "winnow out claims that are not ripe for adjudication"); *Window Gallery of Knoxville v. Davis,* 1999 WL 1068730, at *4 (Tenn.Super.Ct. Nov. 24, 1999) (retail seller of windows must exhaust remedies against defendant contractor, to whom seller furnished windows, before "proceed[ing]" against homeowner under theory of unjust enrichment).

**510**

2. Plaintiffs' unjust enrichment claim under Tennessee law is DISMISSED without prejudice.

3. Plaintiffs may proceed on all remaining claims in the second amended indirect purchaser complaint.