Diane LORIX, individually and on behalf of all others similarly situated, Appellant,

v.

CROMPTON CORPORATION, et al., Respondents, Flexsys NV, et al., Defendants, Bayer Corporation, Defendant.

No. A05–2148.

Supreme Court of Minnesota.

Aug. 2, 2007.

Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St. Paul, MN, for Appellants.

Michael A. Lindsay, Dorsey & Whitney, LLP, James S. Simonson, Gray Plant Mooty, Mooty & Bennett, PA, Minneapolis, MN, J. Andrew Read, Jones Day, Benjamin G. Bradshaw, O'Melveny & Myers, LLP, Washington, D.C., for Respondents.

Richard A. Lockridge, Lockridge Grindal Nauen, PLLP, Minneapolis, MN, for Amicus Curiae American Antitrust Institute.

Brian Dillon, Assistant Attorney General, State of Minnesota, St. Paul, MN, for Amicus Curiae State of Minnesota.

## OPINION

ANDERSON, G. BARRY, Justice.

Plaintiff, a consumer, brought a class action lawsuit under Minnesota antitrust law alleging that she paid more for tires as a result of defendants' conspiracy to fix the prices of rubber-processing chemicals. The district court granted defendants' motion to dismiss on the pleadings for lack of standing, and the court of appeals affirmed. We reverse and hold that the plaintiff has standing to sue under Minn. Stat. § 325D.57 (2006).

In this antitrust class action, Plaintiff Diane Lorix alleges that defendants Crompton Corporation, Uniroyal Chemical Company, Inc., Uniroyal Chemical Company, Limited, Flexsys NV, Flexsys America LP, Bayer AG, Bayer Corporation, Rhein Chemie Rheinau GmbH, and Rhein Chemie Corporation (collectively "Crompton"), manufacturers of rubber-processing chemicals, agreed to fix the prices of chemicals sold to tire manufacturers. Price fixing is a violation of Minnesota antitrust law. Minn.Stat. § 325D.53, subd. 1(A) (2006). Lorix alleges that she, along with the rest of the putative class, purchased tires manufactured using the price-fixed chemicals and that she paid more for the tires than she would have in the absence of the anti-competitive agreement. Lorix's complaint asserts that she purchased tires "manufactured using rubber processing materials sold by Defendants." Lorix stated at oral argument that she does not know whether the chemicals are present in the tires she purchased or were consumed in the manu-

facturing process, and that discovery would provide an answer to that question.

This lawsuit is one of several filed in state courts across the country against manufacturers of rubber-processing chemicals, sparked by government investigations into price fixing in Europe and the United States. Some of the defendants pleaded guilty in criminal cases and paid criminal fines. *See Moniz v. Bayer Corp.*, 484 F.Supp.2d 228, 229 (D.Mass.2007); *Crouch v. Crompton Corp.*, Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, at *20 (N.C.Super.Oct.28, 2004). Direct purchasers of rubber processing chemicals have also filed a nationwide class action suit against manufacturers of rubber-processing chemicals. *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 355 (N.D.Cal.2005) (granting plaintiffs' motion for class certification).

In this case, the district court applied the factors in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereinafter "*AGC*"), and granted Crompton's motion to dismiss on the pleadings, concluding that to sue in antitrust in Minnesota, a plaintiff must be "either a consumer or a customer in the particular industry and there must be neither speculative damages nor risk of duplicative recoveries." The court of appeals affirmed, holding that Minnesota antitrust law requires that an antitrust plaintiff "be a participant or competitor in the market restrained by the alleged antitrust violation." *Lorix v. Crompton Corp.*, 720 N.W.2d 15, 19 (Minn. App.2006). Noting that Lorix did not allege that she purchased the chemicals manufactured by the defendants, the court held that she lacked standing. *Id.* at 18–19. We granted Lorix's petition for review.

**I.**

Lorix argues that the plain language of Minn.Stat. § 325D.57 affords her standing. The statute provides:

> Any person * * * injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees. In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a defendant.

Crompton argues that, despite the broad language of section 325D.57, antitrust standing has well-established boundaries, and that one such boundary prevents suit by a plaintiff who never purchased the product that was the subject of the alleged price fixing. Crompton argues that "any person" cannot be read literally and that the "direct or indirect" language only removes federal antitrust law's per se bar to indirect purchaser suits. According to Crompton, the district court and court of appeals correctly applied "common-sense principles of remoteness and proximate cause."

We review an appeal from a dismissal on the pleadings de novo. *See Barton v. Moore*, 558 N.W.2d 746, 749 (Minn. 1997). When considering a motion for judgment on the pleadings, the court must accept the allegations contained in the pleading under attack as true, and assumptions made and inferences drawn must favor the non-moving party. *State ex rel. City of Minneapolis v. Minneapolis St. Ry. Co.*, 238 Minn. 218, 223, 56 N.W.2d 564, 567 (Minn.1952). It is immaterial at the pleadings stage whether the plaintiff can prove the facts alleged. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 739 (2000). "The object of all interpretation and construction of laws is to

ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006). "When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.*

■ Antitrust laws should be broadly construed to effectuate their purpose. *Minnesota–Iowa Television Co. v. Watonwan T.V. Imp. Ass'n,* 294 N.W.2d 297, 305 (Minn.1980). The primary purpose of antitrust laws is to protect interbrand competition. *State Oil Co. v. Khan,* 522 U.S. 3, 14, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). The private causes of action created by Minnesota antitrust law "reflect a clear legislative policy encouraging aggressive prosecution of statutory violations." *State by Humphrey v. Philip Morris Inc.,* 551 N.W.2d 490, 495 (Minn.1996).

■ Standing is a legal requirement that a party have a sufficient stake in a justiciable controversy to seek relief from a court. *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The primary goal of the standing requirement is to ensure that the factual and legal issues before the courts will be vigorously and adequately presented. *Channel 10, Inc. v. Ind. Sch. Dist. No. 709, St. Louis County,* 298 Minn. 306, 314, 215 N.W.2d 814, 821 (1974). Standing is acquired in two ways: either the plaintiff has suffered some "injury-in-fact" or the plaintiff is the beneficiary of some legislative enactment granting standing. *Philip Morris Inc.,* 551 N.W.2d at 493; *Snyder's Drug Stores, Inc. v. Minn. State Bd. of Pharmacy,* 301 Minn. 28, 31–32, 221 N.W.2d 162, 165 (1974). An injury-in-fact is a concrete and particularized invasion of a legally protected interest. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

To determine whether Lorix has standing, we first review several key points of federal and Minnesota antitrust law, including the Supreme Court's decisions in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *AGC;* the 1984 amendment to Minn.Stat. § 325D.57; and our own decision in *Philip Morris Inc.*

### A. Federal Antitrust Law

■ Federal antitrust law does not provide a remedy for every injury flowing from an antitrust violation. Standing under federal antitrust law, rather, has prudential limits based on remoteness of injury and complexity of proof. " 'An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but 'despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.' " *AGC,* 459 U.S. at 534, 103 S.Ct. 897 (quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 476–77, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)). " 'It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.' " *Id.* at 535, 103 S.Ct. 897 (quoting *Blue Shield,* 457 U.S. at 477, 102 S.Ct. 2540). The Supreme Court explored the scope of federal antitrust law injury and standing in *Hanover Shoe, Illinois Brick,* and *AGC.*

In *Hanover Shoe,* the Court held that an antitrust defendant could not argue that a plaintiff was not injured because the plaintiff had "passed on" any illegal overcharges to downstream consumers. 392 U.S. at 491–92, 88 S.Ct. 2224. The case involved a treble damages action by a shoe

manufacturer against a manufacturer of shoe machinery. *Id.* at 483, 88 S.Ct. 2224. The Court rejected the defendant's pass-on defense as a matter of law (with limited exceptions not relevant here) for two reasons. *Id.* at 492–94, 88 S.Ct. 2224. First, the defense would burden courts with attempts to trace the effects of an overcharge through the entire chain of purchase and apportion the damages among direct and indirect purchasers. *Id.* at 492–93, 88 S.Ct. 2224. Second, direct purchasers are better situated to sue for antitrust violations, because any individual indirect purchaser would have an insufficient stake in the lawsuit to prompt her to pursue relief. *Id.* at 494, 88 S.Ct. 2224.

In *Illinois Brick,* the Court held that an indirect purchaser of price-fixed goods was not a party "injured in his business or property" within the meaning of section 4 of the Clayton Act, 15 U.S.C. § 15 (2000). 431 U.S. at 728–29, 97 S.Ct. 2061. The plaintiffs, various state and local government entities, alleged a price-fixing conspiracy among manufacturers of concrete blocks. 431 U.S. at 726, 97 S.Ct. 2061. The plaintiffs did not purchase concrete blocks directly, but did purchase buildings made with the blocks. *Id.* The plaintiffs alleged that overcharges from the manufacturers were passed to them through masonry contractors and general contractors. *Id.* at 726–27, 97 S.Ct. 2061. The Court refused to recognize this "offensive pass-on" theory for two policy reasons. *Id.* at 730, 97 S.Ct. 2061. First, "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants" because a direct purchaser could recover an overcharge that had been passed on to an indirect purchaser, who could also recover it. *Id.* Second, the "evidentiary complexities and uncertainties" that precluded a pass-on defense in *Hanover Shoe* were "multiplied in the offensive use of pass-on by a plaintiff

several steps removed from the defendant in the chain of distribution." *Illinois Brick,* 431 U.S. at 732, 97 S.Ct. 2061. Faced with the choice of overturning *Hanover Shoe* or barring federal indirect purchaser suits, the Court chose the latter. *Illinois Brick,* 431 U.S. at 736–37, 97 S.Ct. 2061. The Court noted that "the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4." *Id.* at 728, n. 7, 97 S.Ct. 2061. *Illinois Brick* thus did not address federal antitrust standing. *Id.*

Justice Brennan, joined by Justices Marshall and Blackmun, dissented in *Illinois Brick. Id.* at 748, 97 S.Ct. 2061. Justice Brennan argued that the majority's bar to indirect purchaser suits "flouts Congress' purpose and severely undermines the effectiveness of the private treble-damages action as an instrument of antitrust enforcement" by precluding injured consumers from recovering damages while leaving middlemen, who may pass on any illegal overcharges, with little incentive to sue. *Id.* at 749, 97 S.Ct. 2061 (Brennan, J., dissenting). Conceding that "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable," Justice Brennan concluded that "if the broad language of § 4 means anything, surely it must render the defendant liable to those within the defendant's chain of distribution. It would indeed be 'paradoxical to deny recover[y] to the ultimate consumer while permitting the middlemen a windfall recovery.'" *Id.* at 760–61, 97 S.Ct. 2061 (Brennan, J., dissenting) (quoting P. Areeda, *Antitrust Analysis: Problems, Text, Cases* 75 (2d ed.1974)).

The Supreme Court provided its most comprehensive statement on federal antitrust standing in *AGC.* The Court held

that a labor union lacked standing to sue a contractors' association under the Sherman Act for an alleged conspiracy to restrain the union's business activities. *AGC,* 459 U.S. at 520–21, 103 S.Ct. 897. The Court noted that when Congress enacted the Sherman Act, it intended established common-law limits on liability to shape the scope of antitrust liability. *AGC,* 459 U.S. at 532, 103 S.Ct. 897. The AGC Court, accordingly, undertook to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535, 103 S.Ct. 897. The factors addressed by the Court included: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the injury alleged is direct or indirect; (3) whether there are more directly injured plaintiffs with motivation to sue; (4) whether the damages claims are speculative; and (5) whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages.[1] *Id.* at 538–45, 103 S.Ct. 897. The Court counseled against across-the-board rules, suggesting that courts should "analyze each situation in light of the factors set forth" in the opinion. *Id.* at 536 n. 33, 103 S.Ct. 897. Applying all the factors, the Court concluded that the labor union had not suffered an injury compensable under federal antitrust law. *Id.* at 545, 103 S.Ct. 897. Many state courts, including a Minnesota state district court, have since applied the *AGC* factors to determine if an antitrust plaintiff has standing. *See, e.g., Gutzwiller v. Visa U.S.A., Inc.,* No. C4-04-58, 2004 WL 2114991, at *5–6 (Minn.Dist.Ct. Sept.15, 2004).

**B. Minnesota Antitrust Law**

 Minnesota antitrust law is generally interpreted consistently with federal antitrust law. *Minn. Twins P'ship v. State,* 592 N.W.2d 847, 851 (Minn.1999). As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently. Minnesota is not required, however, to abide by federal antitrust standing limitations. *See Snyder's Drug Stores,* 301 Minn. at 31–32, 221 N.W.2d at 165. The desire for harmony between federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit. " 'The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct,' " but " 'to achieve this uniformity or predictability, we are not required to define who may sue in our state courts in the same way federal courts have defined who may maintain an action in federal court.' " *Bunker's Glass Co. v. Pilkington, PLC,* 206 Ariz. 9, 75 P.3d 99, 106 (2003) (quoting *Comes v. Microsoft Corp.,* 646 N.W.2d 440, 446 (Iowa 2002)); *see Comes,* 646 N.W.2d at 446 (noting that the purpose of Iowa's antitrust harmonization statute was to "achieve uniform application of the state and federal laws prohibiting monopolistic practices," not to define who can sue under state antitrust law); *see also* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.14 (2d ed. 1984) ("Federal courts have stated that state law of standing should be applied as to state rights * * *.").

 In 1984, our legislature added the words "directly or indirectly" to Minn.Stat. § 325D.57 to make clear that, contrary to

---

**1.** The Court's wide-ranging discussion did not include a comprehensive list of the factors relied on, but courts and commentators have generally recognized these five. *See, e.g., Am.*

*Ad Mgmt., Inc. v. Gen. Tel. Co.,* 190 F.3d 1051, 1054–55 (9th Cir.1999); *see also, e.g., McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996) (identifying different factors).

*Illinois Brick,* Minnesota antitrust law permits indirect purchasers to recover. *Philip Morris Inc.,* 551 N.W.2d at 497; Hearing on Sen. F. 1807, Sen. Jud. Comm., 73rd Minn. Leg., Mar. 19, 1984 (minutes) (Statement of Steve Kilgriff, Assistant Attorney Gen.) ("All we're saying is that under Minnesota law we recognize that indirect purchasers should have his or her [sic] rights to determine damages as well as the direct purchaser."). Minnesota is one of 25 states to enact such *"Illinois Brick* repealer" statutes. Daniel R. Karon, *"Your Honor, Tear Down that* Illinois Brick *Wall!" The National Movement Toward Indirect Purchaser Antitrust Standing and Consumer Justice,* 30 Wm. Mitchell L.Rev. 1351, 1361 (2004). Eight other "non-repealer" states permit indirect purchasers to sue under state consumer protection statutes or under judicial construction of state antitrust acts. *Id.* Altogether, 33 states and the District of Columbia allow claims by indirect purchasers. *Id.*

This court's only substantive discussion of antitrust standing since the 1984 amendment to section 325D.57 occurred in *Philip Morris Inc.,* where we noted that Minnesota antitrust law contains an "expansive grant of standing" designed to protect Minnesota citizens from "sharp commercial practices." 551 N.W.2d at 496–97. We held that Blue Cross, a nonprofit health services organization, had standing to sue tobacco companies under Minnesota antitrust law for increased health care costs due to the tobacco companies' conspiracy to suppress research on the deleterious effects of smoking and to manipulate nicotine levels in cigarettes in order to induce addiction in smokers. *Id.* at 491–92. We based our holding on the plain language of section 325D.57, stating that "[i]t is clear that this expansive grant of standing reaches the injuries suffered by Blue Cross." *Philip Morris Inc.,* 551 N.W.2d at 496.

## II.

The district court and court of appeals relied on *AGC* and other federal case law to hold that an antitrust plaintiff must be a consumer or competitor in the market restrained by the antitrust violation. We conclude that both courts misinterpreted Minnesota antitrust law and that the *AGC* factors do not provide the benchmark for antitrust standing in Minnesota.

### A. *AGC*

The district court correctly recognized that *AGC* factors (2) (whether the injury alleged is direct or indirect) and (3) (whether there are more directly injured plaintiffs with motivation to sue) cannot apply in Minnesota because indirect purchasers are explicitly vested with a cause of action under Minn.Stat. § 325D.57. The district court's application of *AGC* factors (1) (whether the plaintiff is a consumer or competitor in the allegedly restrained market) and (5) (whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages), however, was misplaced. For one thing, none of the *AGC* factors was intended to be determinative, even under the more restrictive boundaries of federal antitrust standing. The district court, nevertheless, turned *AGC* factors (1) and (5) into absolute requirements for standing under Minnesota antitrust law by stating that an antitrust plaintiff must be "either a consumer or a customer in the particular industry and there must be neither speculative damages nor risk of duplicative recoveries." The rule espoused by the district court is contrary to the Supreme Court's acknowledgement that " 'it is simply not possible to fashion an across-the-board and easily applied standing rule which can serve as a tool of decision for every case,' " *AGC,* 459 U.S. at 536 n. 33,

103 S.Ct. 897 quoting Sherman, *Antitrust Standing: From* Loeb *to* Malamud, 51 N.Y.U. L.Rev. 374, 407 (1976), and makes Minnesota antitrust standing *more* restrictive than federal antitrust standing, in contravention of the 1984 amendment to Minn.Stat. § 325D.57.

■ Even viewed as guideposts rather than requirements, the *AGC* factors are not harmonious with our antitrust law. For example the first part of *AGC* factor (5) (complexity of apportionment and risk of duplicative recoveries) was at the heart of Illinois Brick's bar to indirect purchaser suits. *Illinois Brick* explained that an indirect purchaser suit is, by nature, complicated and uncertain: "[t]he demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." 431 U.S. at 732–33, 97 S.Ct. 2061. By expressly permitting indirect purchaser suits, our legislature has rejected the notion that Minnesota courts are not to be burdened with the complex apportionment inherent in those suits.

With regard to the risk of duplicative recoveries under *AGC* factor (5), section 325D.57 allows a court to "take any steps necessary to avoid duplicative recovery against a defendant" in a subsequent action arising from the same conduct. To the extent that our courts cannot ameliorate the risk of duplicative recovery, as where parallel proceedings in federal courts or courts in other states may result in later awards based on the same injuries, this risk is inherent in the dual system of private antitrust enforcement created by *Illinois Brick* and *California v. ARC America Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (holding that federal antitrust law's bar to indirect purchaser suits does not preempt state courts from entertaining such suits). *See Report of the Indirect Purchaser Task Force*, 63 Antitrust L.J. 993, 994 (Spring 1995) (concluding that the current system of antitrust enforcement creates the risk that the full amount of an anticompetitive overcharge, trebled, will be recovered by direct purchasers under federal law and indirect purchasers at every successive stage of distribution under state law). While this risk is a legitimate and important consideration, it is not a risk that our court may remedy by restricting Minnesota antitrust law in ways that our legislature has not.

As for *AGC* factor (1), the *AGC* Court noted that the plaintiff labor union was "neither a consumer nor a competitor in the market in which trade was restrained" only to highlight that the union may have suffered no injury at all—because it was not clear "whether the Union's interests would be served or disserved by enhanced competition in the market," 459 U.S. at 539, 103 S.Ct. 897—and to highlight that any injury suffered was not related to the Sherman Act's "central interest in protecting the economic freedom of participants in the relevant market." *Id.* at 538, 103 S.Ct. 897. *AGC* did not make a plaintiff's status as a consumer or competitor in the restrained market a sine qua non of antitrust standing. Rather, *AGC* used that status as a tool to compare the plaintiff's alleged injury to the goals of antitrust law. While Minnesota courts should analyze an alleged injury's relation to the goals of antitrust law by identifying the markets involved, the market analysis is not the focus of the standing inquiry.

■ *AGC* factor (4), whether the damages claims are speculative, is relevant to standing under the Minnesota antitrust law. As we explain below, we conclude that at this stage of litigation Lorix's damage claims are not so speculative as to place her outside the protection of Minnesota antitrust law.

■ It is true, as Crompton notes, that "the question of which persons have been injured by an illegal overcharge * * * is analytically distinct from the question of which persons have sustained injuries too remote to give them standing" and that *Illinois Brick* addressed the scope of antitrust injury, not standing, under the Clayton Act. *Illinois Brick,* 431 U.S. at 728 n. 7, 97 S.Ct. 2061. Crompton urges, therefore, that the 1984 amendment to Minn. Stat. § 325D.57, as a response to *Illinois Brick,* has no effect on our standing analysis and that we must apply *AGC.* We do not agree. *AGC* was informed by *Illinois Brick* and repeated, as antitrust standing guidelines, Illinois Brick's reservations about indirect purchaser suits. "In *Illinois Brick * * ** we held that treble damages could not be recovered by indirect purchasers * * *. *The same concerns* should guide us in determining whether the Union is a proper plaintiff under § 4 of the Clayton Act." *AGC,* 459 U.S. at 544, 103 S.Ct. 897 (emphasis added). We do not believe that the legislature repudiated *Illinois Brick* and invited indirect purchaser suits only for courts to dismiss those suits on the pleadings based on the very concerns that motivated Illinois Brick.

■ We recognize that some state courts have applied the *AGC* factors to state antitrust claims. *See, e.g., Kanne v. Visa U.S.A., Inc.,* 272 Neb. 489, 723 N.W.2d 293, 297–301 (2006) (holding that the Nebraska Antitrust Act required the court to follow federal courts' construction of the Clayton Act); *Fucile v. Visa U.S.A., Inc.,* No. 51560–03 CNC, 2004 WL 3030037, at *2 (Vt.Super.Ct. Dec. 27, 2004) (applying *AGC* factors). Other courts do not apply the *AGC* factors. *See, e.g., Moniz,* 484 F.Supp.2d at 231 (denying defendants' motion to dismiss in a state indirect purchasers class action and stating that defendants' reliance on *AGC* was inappo-

site). We will often look to case law from other states for guidance when our own jurisprudence is undefined. *Gordon v. Microsoft Corp.,* 645 N.W.2d 393, 402 n. 9 (Minn.2002). But we conclude that our jurisprudence in this area is sufficient and, with due respect to courts that have chosen to apply *AGC,* we believe application of the *AGC* factors in Minnesota would contravene the plain language of the statute and in some cases thwart the intent of the legislature by barring indirect purchaser suits for the reasons articulated in *Illinois Brick.*

### B. Market participant requirement

■ In upholding the district court, the court of appeals did not rely on the *AGC* factors but stated that "[f]ederal courts have consistently held that an antitrust plaintiff must be a consumer or competitor in the market restrained by alleged antitrust violations." *Lorix,* 720 N.W.2d at 18. The two federal appellate decisions cited by the court of appeals do not compel us to impose a market-participant requirement. The court of appeals quoted *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), for the proposition that to recover, a plaintiff must suffer "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Lorix,* 720 N.W.2d at 18–19. It does not follow from this proposition that Minnesota antitrust law provides a remedy only to participants in the immediately restrained market, and Brunswick itself mentioned no such restriction. The court of appeals also cited *S.D. Collectibles, Inc. v. Plough, Inc.,* 952 F.2d 211 (8th Cir.1991). *Lorix,* 720 N.W.2d at 19. In *S.D. Collectibles,* Collectibles was the sole representative in a five-state territory for the manufacturer of Zinca, a zinc oxide sun care product. 952 F.2d at 212. When Plough obtained the

exclusive right to market Zinca in the territory and Collectibles' agreement was terminated, Collectibles sued Plough, alleging antitrust injury. *Id.* at 212–13. The court noted that "[t]he antitrust laws were designed to protect competition and therefore standing is generally limited to actual market participants," *id.* at 213, and held that Collectibles lacked standing because it was neither a consumer of Zinca nor a competitor of Plough, *id.* at 214. Collectibles did not enjoy antitrust protection because it was not a consumer of *any* product related to the antitrust violation. *S.D. Collectibles,* whatever its precedential value to this court, cannot be read to foreclose antitrust claims in Minnesota by indirect purchasers of goods manufactured with price-fixed components.

█ Our decision in *Philip Morris Inc.* further counsels against a rigid market-participant requirement. In *Philip Morris Inc.,* tobacco companies conspired to "suppress research on the deleterious effects of smoking," 551 N.W.2d at 492, and we held with little discussion that Blue Cross had standing to sue in antitrust based on the increased amounts it paid for healthcare, *id.* at 496. But Blue Cross was a participant in neither the cigarette market (the market in which the tobacco companies participated) nor the healthcare research market (the market restrained by the conspiracy). It is no answer to assert, as Crompton does, that Blue Cross participated in, and the tobacco companies manipulated, the "healthcare market." The patient services market, in which Blue Cross participated, is distinct from the healthcare research market, which the tobacco companies manipulated.[2] Applying Crompton's expansive method of defining markets, we might find standing by noting that Lorix was injured in the "market for rubber-related products," the same market in which Crompton fixed prices. Analysis of the markets involved in an antitrust claim helps assess the relation of the alleged injury to the goals of antitrust law, but the lack of a principled way to define the "market restrained by the antitrust violation" means that this analysis alone cannot determine whether a plaintiff has antitrust standing.

### III.

The fact that the district court and court of appeals erred in applying *AGC* and imposing a market-participant requirement does not necessarily mean that Lorix has standing. The real difficulty lies in defining the outer limits of indirect purchaser standing in Minnesota. "Any person" injured by an antitrust violation may sue under our antitrust law. Minn.Stat. § 325D.57. We have recognized and applied the broad effect of the words "any person." *See Hyatt v. Anoka Police Dep't,* 691 N.W.2d 824, 826 (Minn.2005) ("The word 'any' is given broad application in statutes, regardless of whether we consider the result reasonable."); *Group Health Plan, Inc. v. Philip Morris Inc.,* 621 N.W.2d 2, 8–9 (Minn.2001) (stating that "any person" is plain and unambiguous); *Philip Morris Inc.,* 551 N.W.2d at 496 (applying the plain meaning of Minn.Stat. § 325D.57 to hold that "[i]t is clear that this expansive grant of standing reaches the injuries suffered by Blue Cross").

█ In spite of the apparently limitless language of section 325D.57, howev-

---

**2.** The complaint in *Philip Morris Inc.* alleged, inter alia, that tobacco companies restrained and suppressed research on the harmful effects of smoking and restrained and suppressed the dissemination of information on the harmful effects of smoking. 551 N.W.2d at 492. It did not allege that the tobacco companies interfered with or manipulated delivery of patient care.

er, there are injuries so remotely related to antitrust violations that courts simply cannot provide relief. *Group Health Plan,* 621 N.W.2d at 11 n. 7 ("[W]e do not hold that the scope of those enforcement statutes is entirely without limit."). Standing under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy.

▇▇▇▇▇ We find it unnecessary today to define the outer limits of antitrust standing in Minnesota, because whatever those limits may be, Lorix falls well within them. Lorix alleges that she is an end user of a consumer good whose price was inflated by anticompetitive conduct earlier in the chain of manufacture.[3] The violation complained of—price fixing—is a per se violation of the law that strikes at the heart of antitrust law's purpose of protecting competition. *See* Minn.Stat. § 325D.53, subd. 1(1)(a) (2006). The injury alleged—overcharge—is exactly the sort that would be expected to flow from the violation.

Furthermore, as an end user, Lorix is the party most likely to be injured by an anticompetitive overcharge because she is the only party in the chain of purchase who cannot pass on part or all of that overcharge. *See Illinois Brick,* 431 U.S. at 764, 97 S.Ct. 2061 (Brennan, J., dissenting) (noting that direct purchasers ordinarily "pass on the bulk of their increased costs to consumers"); *Freeman Industs. v.*

*Eastman Chem. Co.,* 172 S.W.3d 512, 520 (Tenn.2005) (noting that indirect purchasers are frequently the "real victims of the antitrust violations"); Cynthia Urda Kassis, Comment, *The Indirect Purchaser's Right to Sue Under Section 4 of the Clayton Act: Another Congressional Response to* Illinois Brick, 32 Am. U.L.Rev. 1087, 1087 (1983) ("Price fixing and other antitrust violations most frequently injure * * * those who purchased goods through retailers and other middlemen rather than directly from the antitrust violator."). To find that an end user such as Lorix lacks standing would be to deny an injured party the opportunity to recover while allowing a windfall to middlemen who passed on the overcharge or, more likely, allowing the violator to escape liability entirely when the middlemen decline to pursue relief. We recognize that Crompton's direct purchasers have chosen to pursue relief in federal court, *see In re Rubber Chems. Antitrust Litig.,* 232 F.R.D. at 348, but this appears to be the exception, not the rule. *See Illinois Brick,* 431 U.S. at 764, 97 S.Ct. 2061 (Brennan, J., dissenting) (noting that middlemen are ordinarily reluctant to sue their suppliers); *Comes,* 646 N.W.2d at 450 ("[D]irect purchasers likely will not enforce antitrust laws out of fear of retaliation by their suppliers * * *."); *Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 473 S.E.2d 680, 687 (1996) ("[T]here are few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation.") (citing Thomas Greene, *Should* Congress Preempt State Indirect Purchaser Laws? Counterpoint: State Indirect Purchaser Remedies Should

---

**3.** We note that the Supreme Court recently opined on the minimum factual allegations that must be pleaded to support a claim of restraint of trade under section 1 of the Sherman Act. *Bell Atl. Corp. v. Twombly,* —— U.S.

——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Because the price-fixing conspiracy at issue here is, in the present posture of the case, undisputed, *Twombly* is not helpful to our decision.

be Preserved, 5 Antitrust 25, 26–27 (1990)).

Crompton advances several reasons why Lorix lacks standing to sue. Crompton's primary argument is that the task of tracing the alleged overcharge from the chemical manufacturers to the end user will be extraordinarily complex and result in overly speculative damage calculations. Crompton directs our attention to various cases in the Visa/Mastercard litigation that Crompton asserts are analagous, including that of our own district court in *Gutzwiller*, 2004 WL 2114991. In these cases, consumers alleged that they paid more for consumer goods due to Visa and Mastercard's illegal tying of debit card services with credit card services. These cases, for the most part, have applied the *AGC* factors to hold that the consumers' injuries are too remote and speculative to afford antitrust standing. *See, e.g., Gutzwiller*, 2004 WL 2114991, at *9; *Beckler v. Visa U.S.A. Inc.*, No. Civ. 09–04–C–00030, 2004 WL 2475100, at *4 (N.D.Dist.Ct. Sept. 21, 2004); *Fucile*, 2004 WL 3030037, at *3–4.

■ The *AGC* factors, as we have explained, do not provide the benchmark for standing under Minnesota antitrust law. *Gutzwiller*, however, does provide an example of an injury that is most likely too remote and speculative to afford standing. The plaintiffs in *Gutzwiller* did not purchase, directly or indirectly, any product or service provided by or manufactured with components from Visa or Mastercard. 2004 WL 2114991, at *6. Rather, they alleged that the overcharges forced upon merchants by Visa and Mastercard were passed on to consumers in the form of higher prices on essentially every good sold in the state of Minnesota, even those purchased with cash. *Id.* at *2. Thus, the market affected by the anticompetitive conduct was in essence the market for all goods bought and sold in Minnesota. Whatever the precise prudential limits on Minnesota antitrust standing, we do not believe that the legislature intended to create "consumer standing" by allowing every person in the state to sue for an antitrust violation simply by virtue of his or her status as a consumer.

■ Lorix's claim, in contrast, is relatively focused: it is limited to purchasers of tires manufactured with price-fixed chemicals. According to Crompton's characterization of Lorix's allegations, Lorix will need to trace overcharges from chemical manufacturers to tire companies, then to tire wholesalers and distributors, then to tire retailers, and finally to consumers.[4] In principle and in practice, this is a far cry from the situation in *Gutzwiller*, where overcharges from Visa and Mastercard would need to be traced through every merchant to every good purchased by every consumer in the state of Minnesota. Lorix, furthermore, alleges price fixing, which at least in theory provides a sounder basis for calculation of damages than the illegal tying arrangement alleged in *Gutzwiller*. Tying cases present unique damages issues because the plaintiff must not only demonstrate that the tying product possesses monopolistic leverage in the market, but also prove the cost or value of

---

4. Lorix indicated at oral argument that her proposed class did not include purchasers of tires attached to used cars, and that any suggestion to the contrary in her complaint was a "drafting error." We find this limitation sensible and are confident the district court can craft other sensible limits on the proposed class. We also note that Lorix has apparently abandoned her earlier position, espoused at the court of appeals, that any Minnesota citizen could sue Crompton because the price-fixing raised the price of tires, which raised the price of transportation, which raised the price of all goods transported by truck within the state.

the tied products free from the unlawful arrangement. *See generally Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670–73 (7th Cir.1985) (describing the process of proving damages in a tying case); *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1284–85 (11th Cir.1982) (same).

Nor can we accept, in the context of a motion to dismiss, Crompton's assertion that Lorix's damages are so speculative as to render proof impossible. Drawing all assumptions and inferences in favor of Lorix, as we must, it is possible that the discovery process will reveal the amount of overcharge from Crompton, the chain of distribution through which the overcharge flowed to Lorix, the degree to which the overcharge may have been absorbed by more direct purchasers, and the impact of other market factors on the price of tires manufactured with price-fixed chemicals. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir.2002) (refusing to find damages too speculative at motion to dismiss stage because antitrust plaintiffs must be afforded an opportunity to present evidence to support their allegations); *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F.Supp.2d 485, 504 (E.D.Pa.2006) ("Nor is this Court able to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge suffered by the instant plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert testimony.").

Ultimately, Crompton's argument that Lorix's alleged damages are too complex and remote to be remedied simply repeats the concerns that motivated *Illinois Brick* and that our legislature, along with many others, has rejected by permitting indirect purchaser litigation. Crompton distinguishes this from other indirect purchaser actions by noting that there are more stages of distribution through which to trace the alleged overcharge. This difference is one of degree, not kind, and Crompton has not persuaded us that the alleged injuries are so far removed from the alleged price fixing as to be unreasonably remote.

Crompton also attempts to wash its hands of the effects of the alleged price fixing by stating that it does not make, market, distribute, or sell the product (tires) that Lorix purchased. We ascribe little meaning to this formality. Antitrust laws, federal and state, provide a remedy for consumers who have purchased goods manufactured with price-fixed components. *See, e.g., D.R. Ward Const. Co.*, 470 F.Supp.2d at 490–91, 505, 509 (denying defendants' motion to dismiss, for lack of standing, claims under the Arizona, Tennessee, and Vermont antitrust acts by consumers who purchased products containing price-fixed plastic additives); *Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 49 (D.D.C. 1999) (allowing, under Minnesota state antitrust law, claims for civil penalties and damages by the state of Minnesota on behalf of the state and indirect purchasers against suppliers of pharmaceutical ingredients); *Carnivale Bag Co., Inc. v. Slide-Rite Mfg. Corp.*, 395 F.Supp. 287, 288–89, 294 (S.D.N.Y.1975) (holding that purchasers of zippers manufactured with price-fixed "slider" components had standing to sue slider manufacturer). We find it beside the point that, in this case, the price-fixed component may or may not be present in the finished product. An antitrust injury occurs when a purchaser is overcharged as a result of anticompetitive conduct, not when she physically acquires a price-fixed good. An antitrust violator should not escape liability simply because, by happy accident, its price-fixed goods

are consumed in the manufacturing process.

We find it instructive that the 1984 amendment to Minn.Stat. § 325D.57 was intended to restore Minnesota antitrust law to its pre-*Illinois Brick* contours. *See* Hearing on Sen. F. 1807, Sen. Jud. Comm., 73rd Minn. Leg., Mar. 19, 1984 (minutes) ("We don't want to be creating causes of action where they wouldn't have existed prior to the *Illinois Brick* case."). Claims of overcharge due to price fixing of components several steps removed from the ultimate consumer proceeded past motions to dismiss and for summary judgment in federal courts prior to *Illinois Brick*. *See, e.g., Illinois v. Ampress Brick Co., Inc.,* 536 F.2d 1163, 1167 (7th Cir.1976) (holding that various governmental entities who allegedly purchased buildings at prices inflated due to defendants' fixing of prices of concrete blocks had standing to sue under the Sherman Act), *rev'd sub nom Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *In re W. Liquid Asphalt Cases,* 487 F.2d 191, 194–95, 200 (9th Cir.1973) (holding that plaintiffs, states that accepted bids for road construction projects including liquid asphalt supplied to contractors at inflated prices, had standing to sue asphalt suppliers); *In re Master Key Antitrust Litig.,* No. 45, 1973 WL 855, at **1, 6 (D.Conn. 1973) (denying defendants' motion for summary judgment in an action by plaintiffs who alleged that they paid higher prices for buildings as a result of overcharges due to defendants' conspiracy to fix prices of locks, keys, and latches); *Armco Steel Corp. v. North Dakota,* 376 F.2d 206, 207–08 (8th Cir.1967) (allowing action by a state against a steel company for overcharges in bids submitted for highway construction projects involving price-fixed metal products).

■ Lorix's claims also satisfy the "target area" test commonly employed in federal courts prior to *Illinois Brick*. Under the "target area" test, a plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. * * * It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690 (internal citations omitted) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)); *see also, e.g., GAF Corp. v. Circle Floor Co., Inc.,* 463 F.2d 752, 757–58 (2d Cir.1972) ("Whether viewed in terms of 'lack of standing' or the absence of *antitrust* damages, the courts, in denying recovery to various kinds of plaintiffs, have sought to confine recovery to those who have been injured by restraints on competitive forces in the economy."); *Mulvey v. Samuel Goldwyn Prods.,* 433 F.2d 1073, 1076 (9th Cir.1970) (noting that the right to sue under section 4 of the Clayton Act was restricted to those persons "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry") (internal quotations omitted). Justice Brennan, dissenting in *Illinois Brick,* noted that "the more liberal, and more widely accepted [test for antitrust standing focused] on whether the plaintiff is within the 'target area' of the defendant's violation." 431 U.S. at 760, 97 S.Ct. 2061 (Brennan, J., dissenting). While we decline to adopt the target area test, we find it noteworthy that Lorix's injury—artificially inflated price of a consumer good—is precisely one which Crompton's price fixing would foreseeably have caused and which antitrust law is intended to prevent and remedy.

We do not mean to minimize the formidable complexities of proof posed by Lorix's claim. Complexity, however, is

hardly foreign to antitrust litigation. "Complex antitrust cases * * * invariably involve complicated questions of causation and damages." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir.1997). We have confidence in the ability of our district courts to manage difficult cases. "The complexity of proving damages through multiple levels of sales is a daunting task, but one to which our courts are equal." *Bunker's Glass Co.*, 75 P.3d at 108.

Our decision does not mean that Lorix will recover, nor do we intimate any view regarding the outcome of this litigation.[5] It is entirely possible that she cannot prove her damages, or that they are minimal.[6] If her claims are purely speculative or unmanageably complex, they will be barred at the summary judgment stage. "The plaintiffs bear the burden of proving the damages caused by a defendant's wrongful conduct. If the plaintiffs cannot present admissible and convincing proof, they cannot recover." *Bunker's Glass Co.*, 75 P.3d at 108. We also expect, in light of the variety of tires available from different manufacturers through different retail outlets, that Lorix faces a challenge meeting the class certification requirements of Minn. R. Civ. P. 23.01. *See* William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of* Illinois Brick, 67 Antitrust L.J. 1, 3 (1999) ("[T]rial courts in a number of the jurisdictions have effectively terminated indirect purchaser class actions by refusing to certify them [as class actions]."). We decide today only that our antitrust law affords her an opportunity to try. We hold that Lorix has standing under Minn. Stat. § 325D.57 to pursue her claim.

Reversed and remanded.

5. We recognize that the cost and difficulty of settlement administration, combined with attorneys' fees, mean that indirect purchaser suits sometimes result in no meaningful recovery for consumers. *See Crouch*, 2004 WL 2414027, at *12 ("[T]he complexities and administrative costs and difficulties [in administering settlements] result in settlements that are something less than sterling from the consumer's point of view."); William M. Landes and Richard A. Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. Chi. L.Rev. 602, 634 (1979) ("In a class action, much of even the compensatory portion of the judgment may end up in the pockets of lawyers or in state treasuries, rather than in the pockets of the people who were actually harmed by the antitrust violation."). We also recognize that indirect purchasers suits sometimes use the threat of unmanageable and complex litigation to compel settlement. *See* Milton Handler, *The Shift From Substantive to Procedural Innovations in Antitrust Suits—The Twenty–Third Annual Antitrust Review*, 71 Colum. L.Rev. 1, 9 (1971). Whatever benefits or detriments indirect purchaser litigation confers on society, it is not the place of this court to restrict remedies that the legislature has made available.

6. The court in *Crouch* summarized the difficulties:

First, the price-fixed item is a product consumed or altered in the manufacturing process. Accordingly, its use will vary with the type of rubber product being made. It may also vary with the nature of the product (chemical) being used and how it is used in the manufacturing process. Different direct purchasers (here, tire manufacturers) might use the various chemicals in various ways in differing products.

2004 WL 2414027, at *21. The *Crouch* court also estimated, based on the price of tires, amount of rubber processing chemicals present, and capacity for price inflation in the industry, that an individual purchaser may have been damaged by $0.01 to $0.11 per tire. *Id.* While we take note of the *Crouch* court's thorough, thoughtful opinion, it includes facts that are not part of the record before us.