STATE OF MINNESOTA

IN SUPREME COURT

A23-1738

Court of Appeals                                                    Hennesy, J.
                                                    Took no part, Gaïtas, J.

In the Matter of
the Minnesota Racing Commission's
Approval of
Running Aces Casino, Hotel & Racetrack's
Request to Amend its Plan of Operation.

                                                    Filed: January 21, 2026
                                                    Office of Appellate Courts

_____

Joshua T. Peterson, Allison J. Mitchell, Casey L. Matthiesen, Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota, for appellant/cross-respondent Shakopee Mdewakanton Sioux Community.

Keith Ellison, Attorney General, Ryan Pesch, Assistant Attorney General, Saint Paul, Minnesota, for respondent Minnesota Racing Commission.

Erica Holzer, Evan A. Nelson, Carly J. Johnson, Maslon LLP, Minneapolis, Minnesota, for respondent/cross-appellant North Metro Harness Initiative, LLC, d/b/a Running Aces Casino, Hotel & Racetrack.

Richard C. Landon, Lathrop GPM LLP, Minneapolis, Minnesota, for amicus curiae Canterbury Park.

David J. Zoll, Laura M. Matson, Arielle S. Wagner, Lockridge Grindal Nauen PLLP, Minneapolis, Minnesota, for amici curiae Mille Lacs Band of Ojibwe, Fond du Lac Band of Lake Superior Chippewa, Leech Lake Band of Ojibwe, Bois Forte Band of Chippewa, Red Lake Nation, Prairie Island Indian Community, and Lower Sioux Indian Community.

_____

1

When a tribal-state compact permits a federally recognized tribe to operate video games of chance in Minnesota and Minnesota law prohibits racetracks from operating video games of chance and other gambling devices and limits the number of tables at a racetrack's card club, the federally recognized tribe has standing to challenge the Minnesota Racing Commission's decision allowing a racetrack to add new electronic table games as an allegedly unlawful expansion of gambling.

Affirmed.

# O P I N I O N

HENNESY, Justice.

In this certiorari appeal, appellant/cross-respondent Shakopee Mdewakanton Sioux Community (the Community) challenges respondent Minnesota Racing Commission's (the Racing Commission's) 2023 decision to approve an amended plan of operation for the card club operated by respondent/cross-appellant Running Aces Casino, Hotel & Racetrack (Running Aces).  The decision permits Running Aces to add one dealer table and 11 player stations to the card club in the form of electronic table games.  The electronic table games at issue involve a live dealer shuffling physical cards.  Images of the cards are transmitted to player stations where patrons make their decisions about game play on video screens.  The Community objects generally to electronic table games at the card club, which the Racing Commission first approved in 2017, and characterizes the decision to approve the additional table and stations as an unlawful expansion of gambling.  Although Running Aces, as one of Minnesota's two licensed racetracks, may offer "card playing activities"

under Minn. Stat. § 240.30, it may not operate video games of chance or other commercial gambling devices, which, under Minnesota law, are the exclusive domain of federally recognized tribes.

The Community raised its arguments in opposition in letters submitted to the Racing Commission prior to its decision on Running Aces's proposed amendment. After the Racing Commission approved the plan, the Community challenged that decision by bringing a petition for a writ of certiorari to the court of appeals as provided by the Minnesota Administrative Procedure Act. The Community argued to the court of appeals that the Racing Commission made "legally erroneous decisions" by permitting Running Aces to operate "gambling devices" or "video games of chance" as defined in Minn. Stat. § 609.75 and by applying an unpromulgated rule that allows electronic table games with the understanding that the games will be played live without the use of a random-number generator. The Community also argued that the Racing Commission erred by approving a floor plan that exceeds the 80-table limit in Minn. Stat. § 240.30. In addition to defending the Racing Commission's decision, both the Racing Commission and Running Aces argued that the Community lacks standing to challenge the Racing Commission's decision.[1] The court of appeals concluded that the Community has standing but rejected the Community's arguments on the merits, thus affirming the Racing Commission's decision.

We begin with the question of standing and conclude that the Community has a legally protected interest in the competition-restricted environment of commercial

---

[1] While the Racing Commission and Running Aces argued at the court of appeals that the Community lacked standing, only Running Aces requested review of this issue.

gambling which gives the Community standing to challenge the Racing Commission's decision. But because we are evenly divided on the Community's request to vacate the Racing Commission's decision, we affirm the court of appeals' decision on the remaining issues without expressing any opinion on the merits.

## FACTS

The Community is a federally recognized tribe with a reservation located in Scott County. Under the federal Indian Gaming Regulatory Act (IGRA), the Community is authorized to operate video games of chance under its compact with the State of Minnesota. The Community owns and operates Mystic Lake Casino Hotel and Little Six Casino where it offers blackjack, other table card games, and various gambling devices and video games of chance.

Minnesota's statutory scheme limits the commercial operation of video games of chance and other gambling devices to federally recognized tribes with tribal-state compacts. *See, e.g.*, Minn. Stat. §§ 299L.07, subd. 2a(b) (restricting the commercial sale of gambling devices to federally recognized tribes authorized to operate gambling devices under tribal-state compacts), 349.61, subd. 2 (stating that the repeal of licenses to operate video games of chance does not affect the validity of tribal-state compacts), 609.75, subds. 4, 8 (defining "video game of chance" and "gambling device"). Other forms of betting and card playing, however, are not so restricted.

The Racing Commission regulates horse racing and betting operations at Minnesota's racetracks. *See generally* Minn. Stat. §§ 240.01–.35 (providing the regulatory structure and regulations for pari-mutuel horse racing). The Legislature authorized on-

4

track pari-mutuel betting on horse racing after Minnesota voters approved an amendment to the Minnesota Constitution in 1982. Minn. Const. art. X, § 8 (providing that "[t]he legislature may authorize on-track parimutuel betting on horse racing in a manner prescribed by law"). Pursuant to the constitutional amendment, the Legislature created the Racing Commission and "detailed that body's licensing and regulatory powers over the establishment and operation of parimutuel betting on horseracing in Minnesota." *Rice v. Connolly*, 488 N.W.2d 241, 244 (Minn. 1992). In 1999, the Legislature enacted legislation permitting the Racing Commission to authorize licensed racetracks to operate card clubs and offer card playing services. Act of May 24, 1999, ch. 206, §§ 1–9, 1999 Minn. Laws 1211–14. *See generally* Minn. Stat. § 240.30 (addressing card clubs). The Legislature intended that card club revenue "be used to improve the horse racing industry by improving purses." Minn. Stat. § 240.135(c).

Minnesota has two licensed racetracks—Running Aces and Canterbury Park. Running Aces operates a harness racing track and card club in Columbus. This appeal concerns the card club.

The Legislature has authorized card clubs to conduct "card playing." Minn. Stat. § 240.01, subd. 4. Card clubs are limited to 80 "tables used for card playing." Minn. Stat. § 240.30, subd. 8(1). The Racing Commission must approve a racetrack's "plan of

operation for card playing activities," Minn. Stat. § 240.30, subd. 6, as well as all amendments to the plan of operation.[2] Minn. Stat. § 240.30, subd. 7.

In 2017, Running Aces asked the Racing Commission to approve a new type of electronic table game manufactured by a company called Interblock. It is Interblock's "dealer-assist" games that are at issue in this case. These involve a live dealer stationed at a table equipped with a camera and card-recognition technology. At the dealer table, a human dealer shuffles physical decks of traditional playing cards using an electronic shuffler. The players sit at player stations with video touch screens set apart from the dealer and other players. The dealer station scans cards as they are dealt and transmits this information to the player stations. At the player stations, players see a green background and digital images of the playing cards dealt, alongside live camera footage of the dealer table and physical cards. Players insert money directly into their stations and place bets using a touch interface, which appear as digital representations of the chips used in traditional over-the-table play. When a player wins, they collect their proceeds by printing a receipt redeemable for cash.

Beginning in 2017, the Racing Commission allowed Running Aces's plan of operation to include electronic table games "with the understanding that the card games would be played 'live' without the use of a random number generator." Since 2017, the

---

[2] There is no dispute that at the time of the Racing Commission's decision Running Aces was prohibited from operating video games of chance and other gambling devices. The Legislature has since clarified that neither a "licensed racetrack" nor the card club it operates may "conduct or provide for play . . . slot machines; video games of chance; or other gambling devices." Act of May 24, 2024, ch. 119, § 5, 2024 Minn. Laws 1957, 1958 (codified at Minn. Stat. § 240.071).

Racing Commission has approved other amendments to the plan of operation, which have increased the number and type of electronic table games permitted at the card club. The Racing Commission approved these amendments with the same "understanding that the card games would be played 'live' without the use of a random number generator."[3] The Community did not appeal these prior amendments.

In May 2023, Running Aces requested that the Racing Commission approve another amendment to its plan of operation. Specifically, Running Aces sought "to change the current layout to include one Stadium three Card Poker table with 11 player stations, one Aces Live 5 Card Draw Poker [table] with 11 player stations, and one Multi Hand Blackjack and Baccarat table that will share 11 player stations." According to Running Aces, the request would "add one dealer table and 11 player stations," which would "result in 33 player stations and four dealer assist tables."

The Community sent letters to the Racing Commission opposing Running Aces' proposed floor plan change and asking the Racing Commission to revoke its prior authorization of electronic table games at Running Aces's card club or, alternatively, to hold a contested case hearing or initiate formal rulemaking to consider whether electronic table games constitute gambling devices or video games of chance. The Racing

---

[3]     Prior to 2017, Running Aces requested the Racing Commission approve a fully automated electronic table game that did not involve a human dealer or physical cards, but used a random-number generator to conduct a blackjack game. *See In re Request of N. Metro Harness Initiative, LLC*, No. A13-0033, 2013 WL 4711204, at *1 (Minn. App. Sep. 3, 2013). The Racing Commission denied this request because it determined the game's fully automated nature makes the game a "gambling device." *Id.* at *3–4. The court of appeals upheld this determination. *Id.* at *4. The electronic table game at issue here is not a fully automated electronic table game.

7

Commission discussed these concerns with the Community. *See* Minn. Stat. § 10.65 (setting forth government-to-government consultation duties with tribes).

Ultimately, the Racing Commission approved Running Aces's request at a meeting on October 19, 2023. By letter dated October 25, 2023, the Racing Commission advised Running Aces that it had "approved the request without amendment and with the same understanding" as stated in the 2017 approval of electronic table games—"that the card games would be played 'live' without the use of a random number generator, and that Running Aces would notify the Commission of any malfunctions of the Interblock equipment and player complaints relating to game play or the voucher system."

A party may appeal a Racing Commission decision by petitioning the court of appeals for a writ of certiorari as provided in the Minnesota Administrative Procedure Act. Minn. Stat. § 240.20. The Community followed this procedure and raised multiple issues in its petition, including arguing that the Racing Commission exceeded its regulatory authority by allowing Running Aces to operate gambling devices and video games of chance which, by law, tribes alone are permitted to operate. Running Aces and the Racing Commission challenged the Community's standing to appeal.

The court of appeals affirmed the Racing Commission's decision. *In re Minn. Racing Comm'n*, No. A23-1738, 2024 WL 4259301, at *10 (Minn. App. Sep. 23, 2024). As an initial matter, the court of appeals determined—contrary to Running Aces's and the Racing Commission's arguments—that the Community has standing to challenge the Racing Commission's decision. *Id.* at *4. On the merits, the court of appeals concluded that (1) the Racing Commission did not err by declining to treat the electronic table games

as gambling devices or video games of chance, *id.* at \*6–7; (2) the Racing Commission's approval of the 2023 amended plan of operation did not rest "on an unpromulgated and therefore unenforceable rule," *id.* at \*9–10; and (3) the amended floor plan does not exceed the number of tables the Racing Commission may approve, *id.* at \*8. We granted the Community's petition for review and Running Aces's request for conditional cross-review on the question of standing.

**ANALYSIS**

In this appeal, the Community challenges the Racing Commission's decision approving the 2023 amended plan of operation for Running Aces's card club. The Community argues that the Racing Commission unlawfully expanded gambling in Minnesota by administratively approving the use of video games of chance and other gambling devices and by permitting the card club to exceed the statutory table limit. The Community also argues that the Racing Commission was enforcing an unpromulgated rule when it approved the amended plan of operation. Running Aces argues that the Community lacks standing to challenge the Racing Commission's decision.

We begin with the question of standing. We require that a party have standing before we will exercise jurisdiction. *In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn. 2011). "Standing is a legal requirement that a party have a sufficient stake in a justiciable controversy to seek relief from a court." *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 338 (Minn. 2011) (quoting *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007)). We review the existence of standing de novo. *Minn. Voters All. v. Hunt*, 10 N.W.3d 163, 167 (Minn. 2024).

9

This appeal is governed by the Minnesota Administrative Procedure Act. Minn. Stat. §§ 14.63–.68; *see* Minn. Stat. § 240.20 (stating that an appeal from a decision of the Racing Commission "must be made in the manner prescribed by sections 14.63 to 14.68"). The Administrative Procedure Act grants standing for "judicial review" to "[a]ny person aggrieved by a final decision" of any agency. Minn. Stat. § 14.63. At issue is whether the Community was "aggrieved" by the Racing Commission's decision. An "aggrieved" party under this statute

> is one who is injuriously or adversely affected by the judgment or decree when it operates on his rights of property or bears directly upon his personal interest. The word "aggrieved" refers to a substantial grievance, a denial of some personal or property right, or the imposition on a party . . . .

*In re Getsug*, 186 N.W.2d 686, 689 (Minn. 1971). To establish standing under Minn. Stat. § 14.63, the party "seeking review must suffer injury in fact as a consequence of the agency action." *In re Sandy Pappas Senate Comm.*, 488 N.W.2d 795, 796 n.1 (Minn. 1992).

An injury in fact "is a concrete and particularized invasion of a legally protected interest." *Lorix*, 736 N.W.2d at 624. A party may establish that an agency action caused them injury in fact based on interference with the party's competition-restricted environment. *See Twin Ports Convalescent, Inc. v. Minn. State Bd. of Health*, 257 N.W.2d 343, 346 (Minn. 1977). In *Twin Ports Convalescent, Inc. v. Minnesota State Board of Health*, the Board of Health issued a license to operate an ambulance service in Duluth without following the proper procedure. *Id.* at 348. Two other licensed ambulance providers sued, arguing that Minnesota law "protect[ed] existing services from competition." *Id.* at 346. We determined that the ambulance providers had standing

because they alleged that they had realized lower profits since the additional license was issued and their "interest in operating a profitable business is arguably within those sought to be protected by the statute." *Id.*

The Community argues that it has standing because the Racing Commission's approval of Running Aces's 2023 amended plan of operation "infringes on the Community's legally protected right to operate video games of chance" and threatens the revenues that fund the Community's government.[4] Running Aces contends that the Community is merely a competitor in a regulated industry and that a speculative economic loss that comes from lawful competition does not confer standing.

The court of appeals concluded that the Community has standing because the Racing Commission's decision potentially harms the Community's "market-restricted interest in operating gambling devices and video games of chance." *Minn. Racing Comm'n*, 2024 WL 4259301, at *4. We agree. As in *Twin Ports*, the agency's decision here interfered with an appealing party's competition-restricted environment. The Community's tribal-state compact, in conjunction with the broader statutory scheme surrounding gambling, creates a competition-restricted environment for commercial gambling. The compact specifically authorizes the Community to operate video games of

---

[4] While the Community also argues that the Racing Commission "effectively conceded" standing when it consulted with the Community before approving the 2023 amended plan of operation, we have said that a party's mere participation in agency proceedings does not guarantee standing to appeal. *Sandy Pappas Senate Comm.*, 488 N.W.2d at 798. Nor does an effective concession as to standing remove the issue from our determination. *See Minn. Sands, LLC v. County of Winona*, 940 N.W.2d 183, 192 n.9 (Minn. 2020) ("Although the County does not press the standing argument, standing is a jurisdictional prerequisite that we can address sua sponte.").

chance. And the statutory scheme limits the commercial operation of video games of chance and other gambling devices to federally recognized tribes with tribal-state compacts. *See, e.g.*, Minn. Stat. §§ 299L.07, subd. 2a(b) (restricting the commercial sale of gambling devices to federally recognized tribes authorized to operate gambling devices under tribal-state compacts), 349.61, subd. 2 (stating that the repeal of licenses to operate video games of chance does not affect the validity of tribal-state compacts). Moreover, the Legislature has explicitly limited the number of tables at card clubs.[5] Minn. Stat. § 240.30, subd. 8(1).

These statutory restrictions are at the heart of the Community's challenge here. The Community contends that the Racing Commission's decision unlawfully expanded gambling by permitting Running Aces to operate video games of chance and other gambling devices and by permitting Running Aces to exceed the statutory table limit. The Community further asserts that the Racing Commission's decision harms the Community's legally protected right to operate video games of chance and other gambling devices and threatens the Community's gaming revenue. The statutory scheme regulating video games of chance and other gambling devices resembles the competition-restricted environment in *Twin Ports*. The Community has alleged a concrete and particularized invasion of its legally protected right to operate video games of chance and other gambling devices. Accordingly, we conclude that the Community has alleged an injury in fact that is protected

---

[5] As previously noted, the Legislature has also recently clarified that a licensed racetrack and its card club are prohibited from operating video games of chance and other gambling devices. Minn. Stat. § 240.071.

by the statutory scheme which restricts commercial operation of video games of chance and other gambling devices to federally recognized tribes and limits the number of tables at card clubs. We therefore affirm the court of appeals' determination that the Community has standing to challenge the Racing Commission's decision.

\* \* \*

Because we are evenly divided on the merits of the Community's request to vacate the Racing Commission's decision, we affirm the court of appeals' decision on the remaining issues. *See Alonzo v. Menholt*, 9 N.W.3d 148, 159 (Minn. 2024).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.


GAÏTAS, J., took no part in the consideration or decision of this case.

13